**UNITED STATES, et al., Plaintiffs,**

v.

**PRODUCTION PLATED PLASTICS, INC., et al., Defendants.**

No. K87–138 CA.

United States District Court, W.D. Michigan.

Jan. 24, 1991.

724

Michael L. Shiparski, Thomas J. Gezon, Asst. U.S. Attys., John A. Smietanka, U.S. Atty., Grand Rapids, Mich., Elliot Eder, U.S. Dept. of Justice, Environment & Natural Resources Div., Environmental Enforcement Section, Washington, D.C., Stuart Hersh, Asst. Reg. Counsel, U.S. E.P.A., Region V, Chicago, Ill., F. Henry Habicht, Asst. Atty. Gen., Land & Natural Resources Div., U.S. Dept. of Justice, William H. Merrill, U.S. Dept. of Justice, Environment & Natural Resources Div., Environmental Enforcement Section, Anna Thode, U.S. E.P.A., Washington, D.C., for the U.S.

Mark S. Meadows, Asst. Atty. Gen., Frank J. Kelley, Atty. Gen., Environmental Protection Div., Lansing, Mich., for Frank J. Kelley.

Steven E. Chester, Mark S. Meadows, Asst. Attys. Gen., Frank J. Kelley, Atty. Gen., Environmental Protection Div., Lansing, Mich., for Michigan Natural Resources Com'n.

Mark S. Meadows, Asst. Atty. Gen., for Gordon E. Guyer.

Richard B. Tomlinson, Driggers, Schultz, Herbst & Paterson, Troy, Mich., Douglas

W. VanEssen, Clary, Nantz, Wood, Hoffius, Rankin and Cooper, Grand Rapids, Mich., for Production Plated Plastics Inc., Michael J. Ladney, Jr., Michigan City Plastics, Inc.

Scott S. Brinkmeyer, William A. Horn, Mika, Meyers, Beckett & Jones, Grand Rapids, Mich., John H. Fildew, Lisa L. Harris, Fildew, Hinks, Gilbride, Miller, Detroit, Mich., for Marguerite Ladney.

Paul T. Sorensen, Warner, Norcross & Judd, Grand Rapids, Mich., Howard T. Weir, Morgan, Lewis & Bockius, Washington, D.C., for Amerace Corp.

Terrence J. Lilly, Lilly, Domeny & Byrne, Kalamazoo, Mich., for Michigan Mut. Ins. Co.

Gregory G. Prasher, Schenk, Boncher & Prasher, Grand Rapids, Mich., Scott G. Johnson, Robins, Kaplan, Miller & Ciresi, Mel I. Dickstein, Minneapolis, Minn., for Protection Mut. Ins. Co. and Allendale Mut. Ins. Co.

Thomas C. Simpson, May, Simpson & Strote, Bloomfield Hills, Mich., for Thomas E. Foster and Edwin E. Foster.

## OPINION

BENJAMIN F. GIBSON, Chief Judge.

Plaintiffs United States of America, Frank J. Kelley, Attorney General for the State of Michigan, the Michigan Natural Resources Commission, and Gordon E. Guyer, Director of the Michigan Department of Natural Resources (collectively the "government"), filed the present action for permanent injunctive relief and imposition of civil penalties against defendants Production Plated Plastics, Inc. ("PPP"), Michigan City Plastics, Inc. ("MCP"), Michael J. Ladney, Jr., and Marguerite Ladney,[1] pursuant to Sections 3008(a) and (g) of the Resource Conservation and Recovery Act of 1976 ("RCRA" or the "Act"), 42 U.S.C. §§ 6928(a) and (g), and Section 48 of the Michigan Hazardous Waste Management Act ("HWMA"), M.C.L.A. § 299.548.

1. Marguerite Ladney and the government have reached a stipulated settlement and the claims against her have been voluntarily dismissed.

References to "Ladney" refer to defendant Michael J. Ladney, Jr. and not to defendant Marguerite Ladney.

On May 14, 1990, this Court determined that defendants Michael J. Ladney Jr. ("Ladney") and PPP operated a hazardous waste facility and stored hazardous waste at their Richland, Michigan facility (the "Richland facility") in violation of RCRA and HWMA. 742 F.Supp. 956. Specifically, Ladney and PPP violated Section 3005(a) and (e) of RCRA, 42 U.S.C. § 6925(a) and (e), and the RCRA regulations, 40 C.F.R. Part 265, by discharging hazardous waste into unlined surface impoundments and by operating waste piles without an RCRA permit or RCRA interim status. They also failed to submit required closure and post-closure plans and commence and complete closure of the Richland facility within the time periods required by RCRA Section 3005(e) and 40 C.F.R. §§ 265.112 and 265.118. These RCRA violations in turn amounted to violations of Sections 6 and 22 of HWMA, M.C. L.A. §§ 299.506 and 299.522, for the continued operation of an unlicensed hazardous waste storage and disposal facility.[2]

Now pending before the Court is plaintiffs' motion for partial summary judgment as to appropriate injunctive relief pursuant to Federal Rule of Civil Procedure 56. Plaintiffs request that the Court order PPP and Ladney:

(i) to conduct, complete and certify closure pursuant to all terms and conditions of the closure plan approved by the State of Michigan, as required by 40 C.F.R. § 265.112(d);

(ii) to provide financial assurance for closure in accordance with 40 C.F.R. § 265.143;

(iii) to comply with all financial responsibility requirements of 40 C.F.R. § 265.147; and

(iv) to comply with all groundwater monitoring requirements in 40 C.F.R. Part 265 Subpart F.

For the reasons stated below, the motion is granted in part and denied in part.

### I.

#### A. Statutory and Regulatory Guidelines

In 1976 Congress enacted RCRA, 42 U.S.C. §§ 6901 *et seq.*, to regulate the disposal of solid waste in the United States. The overriding concern of the legislation is to minimize the adverse environmental impact of solid waste, especially hazardous waste. Its objectives are "to promote the protection of health and the environment and to conserve valuable material and energy resources." 42 U.S.C. § 6902(a).[3] To meet those objectives congress fashioned a far ranging regulatory scheme which is designed to encourage solid waste planning by states and fund resource recovery projects.

Specifically, Section 3004(a) of RCRA requires that the United States Environmental Protection Agency ("EPA") Administrator promulgate regulations establishing performance standards for owners and operators of hazardous waste facilities "as may be necessary to protect human health and the environment." 42 U.S.C. § 6924(a).[4] Section 3005(a) provides for

---

**2.** Although the May 14, 1990, opinion does not discuss MCP's liability, the Court is informed that MCP will stipulate to its liability. Accordingly, the only issue remaining in this action is the appropriate relief to be assessed against Ladney, PPP, and MCP.

**3.** RCRA further states:

The Congress hereby declares it to be the national policy of the United States that wherever feasible, the generation of hazardous waste is to be reduced or eliminated as expeditiously as possible. Waste that is nevertheless generated should be treated, stored, or disposed of so as to minimize the present and future threat to human health and the environment.

42 U.S.C. § 6902(b).

**4.** Section 1004 of RCRA provides:

(5) The term "Hazardous waste" means a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—

(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or

(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(5). Pursuant to the requirements of Section 3001 of RCRA, the Administrator has promulgated regulations identifying hazardous waste characteristics and specific haz-

regulations "requiring each person owning or operating an existing facility ... for the treatment, storage, or disposal of hazardous waste identified or listed under this subchapter to have a permit issued pursuant to this section." 42 U.S.C. § 6925(a). The issuance of operating permits is the primary mechanism established in RCRA for enforcing the hazardous waste regulatory scheme with respect to the owners and operators of treatment, storage, and disposal facilities.

Under section 3005(e) a hazardous waste management facility that was in existence on November 19, 1980, could obtain authority to continue operations as an "interim status" facility by filing a "Part A application" with the EPA. The Part A application requires information concerning the nature of the applicant's business, a scale drawing, photographs and a topographic map of the facility, a description of its hazardous waste management processes and the design capacity of these processes, a specification of the types and quantities of hazardous wastes processed, stored or disposed of at the facility as well as information regarding permits or construction approvals received or applied for by the facility. 40 C.F.R. § 270.14. An interim status facility's operation is limited to the types of wastes and procedures specified in the Part A application and the facility must comply with the operating standards of 40 C.F.R. § 265.

Recognizing widespread noncompliance with the basic regulatory requirements of RCRA, Congress amended the Act in 1984 to provide that all interim status hazardous waste land disposal facilities would automatically lose their interim status unless they certified by November 8, 1985, that they were in compliance with all applicable groundwater monitoring and financial responsibility requirements. 42 U.S.C.

§ 6925(e)(2). Upon losing interim status the facility must immediately cease its hazardous waste management operations and within fifteen days the owner or operator of the facility must submit a "closure" plan for approval by the regional administrator of the EPA. 42 U.S.C. § 6925(a); 40 C.F.R. § 265.112(d)(3)(i).[5] The public is provided an opportunity to comment on the submitted plan. 40 C.F.R. § 265.112(d)(4). The regional administrator must approve, modify, or disapprove the plan within ninety days of its receipt. If the regional administrator modifies or disapproves the plan, the owner or operator has thirty additional days to modify the plan or submit a new plan. Finally, the regional director must approve or modify this plan within an additional sixty days. If the regional director modifies the plan, it becomes an approved plan. *Id.* The owner or operator may apply for an amendment of the plan at any time prior to closure of the facility by submitting a written request to the regional administrator. After review, the proposed modifications must be accepted or rejected by the regional administrator. 40 C.F.R. § 265.112(c).

The facility must begin final closure within ninety days of approval of a closure plan and must complete closure within 180 days of approval of the closure plan, unless the regional administrator permits an extension of the closure period. 40 C.F.R. § 265.113. After closure is complete, the owner or operator is required to maintain post-closure care of the facility for a period of thirty years unless the regional administrator finds that a shorter post-closure care period is sufficient to protect human health and the environment. 40 C.F.R. § 265.117.

The regulations also require that the owner or operator of a surface impoundment landfill or land treatment facility

---

ardous wastes. 40 C.F.R. § 261, subparts C and D.

**5.** 40 C.F.R. § 265.111 requires that a hazardous waste management facility must be closed in a manner that:
　(a) Minimizes the need for further maintenance, and
　(b) Controls, minimizes or eliminates, to the extent necessary to protect human health and

the environment, post-closure escape of hazardous waste, hazardous constituents, leachate, contaminated run-off, or hazardous waste decomposition products to the ground or surface waters or to the atmosphere, and
　(c) Complies with the closure requirements of this subpart.

used to manage hazardous waste must implement a groundwater monitoring system capable of determining the facility's impact on the quality of groundwater in the uppermost aquifer underlying the facility. 40 C.F.R. §§ 265.90 *et seq.* The groundwater monitoring requirement applies during the active life of the facility and throughout the post-closure care period. 40 C.F.R. § 265.111.

Along with the closure, post-closure and monitoring requirements, the owner or operator must establish and maintain financial assurance for proper closure and post-closure care of the facility, as well as liability coverage of specified amounts for bodily injury and property damage to third parties resulting from sudden accidental occurrences at the facility. 40 C.F.R. §§ 265.140 *et seq.* These financial responsibility requirements are designed to ensure that funds are available to close the facility and maintain post-closure monitoring of the facility. An owner or operator has a variety of options to choose from in establishing financial assurance. Among these are establishment of a closure trust fund, obtaining a surety bond guaranteeing payments into a closure trust fund, obtaining a letter of credit or sufficient closure insurance, or passing a financial test set out in the regulations. 40 C.F.R. § 265.143.

Finally, RCRA provides a mechanism by which a state can administer its own program in lieu of the federal program, although the state authorized program may be enforced by the federal government as well as the state. 42 U.S.C. § 6926. Michigan has been granted "Phase I" authorization by the EPA to regulate hazardous wastes through HWMA. HWMA was designed to track RCRA and is the state law equivalent of RCRA. All the regulations of 40 C.F.R. § 265 are adopted by reference in Rule 1003 of regulations promulgated pursuant to HWMA. Mich.Admin. Code § 299.11003(1)(n).

## B. Facts

PPP has engaged in the molding, electroplating, and painting of plastic automobile parts at its Richland facility since 1969. The manufacturing processes involve the creation, discharge, and storage of hazardous wastes. On August 18, 1980, PPP provided the EPA a "Notification of Hazardous Waste Activities", listing specific hazardous wastes that were generated, treated, stored, and disposed of at the Richland facility. PPP also provided the EPA with a Part A application in order to achieve interim status pursuant to RCRA. At this time PPP identified 5,955 tons of listed hazardous waste in surface impoundments and a waste pile at the Richland facility. PPP was not able to meet the financial responsibility requirements of RCRA and so lost its interim status on November 8, 1985. Nevertheless PPP continued operating its hazardous waste management facility without a license until December 7, 1987. Although the proper timetable was not followed, a closure plan which estimated the total cost of closure at $2,300,000 was eventually submitted by PPP and approved by the Michigan Department of Natural Resources ("MDNR") on September 30, 1988. On October 19, 1989, and November 1, 1989, respectively, PPP submitted proposed amendments to the approved closure plan. On December 11, 1989, MDNR provided PPP with a Notice of Deficiency concerning the proposed amendments, and the amendments were never approved. PPP has entirely failed to implement the approved plan.

PPP and Ladney have also failed to meet the financial responsibility requirements of RCRA and have not implemented a groundwater monitoring system pursuant to RCRA. However, they assert that they have implemented a similar groundwater monitoring and purge system under a consent order entered in a previous lawsuit brought by the MDNR in state court.

In their motion for partial summary judgment, plaintiffs argue that RCRA is a strict liability statute which is to be construed liberally in order to effectuate its remedial goals. Once PPP and Ladney were found liable for violations, an injunction requiring them to comply with RCRA should issue as a matter of law. An approved closure plan is in existence, and if

PPP and Ladney had followed the timetable included in the approved plan, closure of the Richland facility would have been complete by now. Given RCRA's overriding concern with minimizing hazardous waste's "present and future threat to human health and the environment", plaintiffs contend the RCRA requirements should be implemented immediately.

PPP and Ladney answer that it is inappropriate to grant a permanent mandatory injunction at the summary judgment stage. Defendants assert that their compliance with a state court order and their alleged inability to fulfill RCRA's financial responsibility requirements are mitigating circumstances which the Court must take into account in fashioning injunctive relief. It is alleged that these mitigating circumstances require the Court to conduct an evidentiary hearing. Further, defendants argue that they cannot fulfill RCRA's financial responsibility requirements and that their implementation of a groundwater monitoring system required by a state court order precludes this Court from requiring them to implement another groundwater monitoring system pursuant to RCRA regulations.

## II.

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c); *Atlas Concrete Pipe, Inc. v. Roger J. Au & Son, Inc.*, 668 F.2d 905, 908 (6th Cir.1982). There is no material issue of fact for trial unless, by viewing the evidence in favor of the non-moving party, a reasonable jury could return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Boddy v. Dean*, 821 F.2d 346, 349 (6th Cir.1987). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510 (citations omitted).

The party moving for summary judgment bears the initial responsibility of informing the court of the basis for its mo-

tion and identifying those portions of the record which demonstrate the absence of a material issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Potters Medical Center v. City Hospital Association*, 800 F.2d 568, 572 (6th Cir.1986). Once the moving party has met its burden, the non-moving party must go beyond the pleadings and come forward with specific facts to show that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 322–24, 106 S.Ct. at 2552–53. If after adequate discovery the party bearing the burden of proof fails to make a showing sufficient to establish an essential element of his claim, summary judgment is appropriate. *Id.*

The hornbook rule regarding injunctive relief is that in order to prevail a plaintiff must prove that there is no adequate remedy at law, that the plaintiff may suffer an irreparable injury if an injunction is not granted and that the balance of the equities justifies an injunction. For this reason an evidentiary hearing is normally required before injunctive relief may be granted. *United States v. McGee*, 714 F.2d 607, 613 (6th Cir.1983). However, it has been held that when the plaintiff is a governmental entity, or private attorney general, and the activity may endanger public health, injunctive relief is proper without undertaking a balancing of the equities. *Environmental Defense Fund, Inc. v. Lamphier*, 714 F.2d 331, 337–38 (4th Cir.1983). Likewise in cases of public health legislation, the emphasis in balancing the equities shifts from irreparable injury to concern for the general public interest. *Id.*

The Supreme Court has recently held that when environmental legislation is at issue the court's focus should be on the *purpose* of the legislation. An injunction should not automatically issue whenever there is a statutory violation. Only if the conduct complained of thwarts the legislative purpose and the statute specifically provides for injunctive relief may the court issue an injunction without undertaking a balancing of the equities or finding irreparable injury. *Amoco Production Co. v.*

*Gambell,* 480 U.S. 531, 542–43, 107 S.Ct. 1396, 1402–03, 94 L.Ed.2d 542 (1987); *See also Weinberger v. Romero–Barcelo,* 456 U.S. 305, 313, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982).

Even applying the traditional equity standards though, an injunction is normally the proper remedy for violations of an environmental statute. There is rarely an adequate remedy at law for an environmental injury, the injury is usually irreparable, and the important role of the public interest often shifts the balance of the equities in favor of equitable relief. *Gambell,* 480 U.S. at 545, 107 S.Ct. at 1404. *See also Lamphier,* 714 F.2d at 338 (when an injunction is authorized by statute irreparable injury need not be shown); *United States v. White,* 769 F.2d 511, 515 (8th Cir.1985) (If the prerequisites for a statutory remedy have been demonstrated and an injunction will fulfill the legislative purpose then the injunction should be granted).

### III.

#### A. Implementation of Approved Closure Plan

Plaintiffs request that this Court order PPP and Ladney to finally implement the closure plan approved by the MDNR on September 30, 1988. As a preliminary matter defendants argue that injunctive relief is an inappropriate remedy to grant at the summary judgment stage and that the traditional standards for equitable relief require the Court to conduct an evidentiary hearing. This argument fails for two reasons.

■ First, it simply is not true that an evidentiary hearing is always required before an injunction is issued. When the evidence presented by affidavit and other documentation clearly establish the plaintiff's right to an injunction, a hearing need not be conducted. *American Can Co. v. Mansukhani,* 814 F.2d 421, 425 (7th Cir. 1987); *Socialist Workers Party v. Illinois State Board of Elections,* 566 F.2d 586 (7th Cir.), *affirmed* 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979). *See McCarthy*

*v. Briscoe,* 429 U.S. 1317, 1324, 97 S.Ct. 10, 14, 50 L.Ed.2d 49 (1976).

■ Moreover, as discussed above, the traditional requirements for injunctive relief are less rigid when environmental legislation is at issue. Following the Supreme Court's decision in *Gambell,* if the purpose of the legislation is thwarted by failure to comply, and the legislation specifically authorizes injunctive relief, no finding of irreparable injury or balancing of the equities need be made. Even if these traditional prerequisites are considered by the court, equitable relief will often issue given that an environmental injury is usually irreparable, plaintiffs rarely have an adequate remedy at law, and special weight must be given to the public interest in balancing the equities.

■ Because no material issue of fact remains as to defendants' liability, two issues now face the Court concerning the appropriateness of granting injunctive relief. First, does defendants' violation thwart the purpose of RCRA? If it does, an injunction should issue as a matter of law. Second, if the violation is not directly at odds with RCRA's purpose, is an injunction nevertheless compelled by a balancing of the equities?

As to the first issue, the purpose of RCRA as stated in its declaration of policy is to minimize hazardous waste's "present and future threat to human health and the environment." 42 U.S.C. § 6902(b). In failing to implement a closure plan mandated by RCRA, defendants are acting directly at odds with the stated purpose of RCRA. Every day that the Richland facility remains unclosed the threat from the hazardous waste stored there goes unabated. In addition, the Act specifically authorizes the issuance of injunctive relief to effectuate its goals. 42 U.S.C. § 6928(a)(1). Under the *Gambell* analysis it is clear that once liability has been established, as it has been here, an injunction ordering compliance with RCRA's closure requirements must be granted.

Even applying the traditional standards for issuing injunctive relief, implementation of the approved closure plan is mandated.

It is evident that despite defendants' assertions to the contrary there is no adequate remedy at law.[6] Money damages will not close the Richland facility. Given the harm already caused by defendants' violations and the continuing threat to human health and the environment, closure is the only adequate remedy. If the facility is to be closed pursuant to RCRA, it must be closed by the owners or operators. There is no other mechanism to effectuate closure under the Act. Irreparable injury is established by the nature of hazardous wastes, and in weighing the public interest the Court notes once again that RCRA is specifically designed to protect the public from the threat of harm caused by hazardous waste. As long as closure of the facility is not completed, that threat exists and is sufficient in itself to compel closure. *See USEPA v. Environmental Waste Control, Inc.,* 917 F.2d 327, 332 (7th Cir.1990) (Permanent injunction pursuant to RCRA was supported by potential danger to environment and public health.)

The only "equity" in the balance which weighs in defendants' favor is that closure of the facility will be expensive. Defendants maintain that they do not presently have the $2,300,000 necessary to complete closure and that imposition of the requested relief will simply lead to contempt citations being issued against defendants. Defendants rely on the affidavit of Thomas Hinsberg, a certified public accountant, for the proposition that they do not have adequate funds to implement the approved closure plan.[7] In examining this argument the Court is cognizant of the fact that defendants had the financial wherewithal to operate the Richland facility for over two years *after* it lost interim status. RCRA is designed to ensure that closure takes place at a time when owners and operators have the funds necessary to comply. If Ladney and PPP had fulfilled their obligations under RCRA beginning on November 8, 1985, the facility would have been closed some time in early 1986. Now, almost five years after closure should have been complete, there is no equity in permitting defendants to escape liability because they claim not to have the funds necessary to meet that liability.

It is also apparent that upon ordering defendants to close the facility today they are not required to deliver full payment for closure tomorrow. There is no requirement in RCRA that the entire cost of closure be paid at once. Defendants' main concern seems to be that they hold many non-liquid assets which will take some time to liquidate. Although the approved plan estimates that closure will cost $2,300,000, implementation of the plan will likely cost substantially less. There is nothing which prohibits defendants from beginning the closure process immediately. As it becomes necessary to expend more funds, assets can be liquidated to satisfy defendants' obligations until closure is complete. In any event defendants' unsubstantiated assertion that they are unable to pay for closure is an insufficient reason to deny injunctive relief. Plaintiffs have satisfied their burden of proving that a permanent injunction is warranted and the Hinsberg affidavit, relying as it does on unsubstantiated statements made by defendants, does

---

**6.** Defendants maintain that they are entitled to have a money judgment, rather than an injunction, entered against them in order that their contribution claims against various third-parties may survive. However, there is no reason to believe that any valid contribution claim will be prejudiced by granting injunctive relief. Defendants may pursue these claims in separate proceedings. In any event, the availability of RCRA's remedies do not hinge on a defendant's ability to seek contribution.

**7.** Despite defendants' assertion that the Court must "believe" what is stated in the affidavit, taken at face value the affidavit is worthless. Hinsberg did not conduct an audit of PPP or Ladney. The basis for his conclusion that defendants do not currently have $2,300,000 is a letter from Ladney and information he received from unnamed PPP Personnel. In other words Hinsberg's affidavit is based solely on unsubstantiated information provided by defendants. He even states, "None of the aforementioned financial information from Mr. Ladney and PPP has been audited, reviewed or compiled by me in accordance with generally accepted accounting principles and *I do not express any form of assurance on it"* (emphasis added). If defendants' own expert witness cannot attest to the truth of what he asserts, the Court is perplexed as to why it must "believe" the affidavit.

nothing to raise a material issue of fact for trial.

Finally defendants contend that it is impossible for them to implement the approved closure plan because of changes in the rules and regulations applicable to disposal of hazardous wastes. They submit the affidavit of Ronald C. Waybrant, an environmental consultant, which states that the approved closure plan does not provide for "stabilization" of the wastes before they are placed in a landfill. Waybrant maintains that stabilization is now required before the wastes may be buried. He also avers that the approved closure plan relies on the assumption that a specific smelter in Canada would be available to process certain sludges now stored at the Richland facility. He states that the smelter cannot process the sludge at the rate required by the plan.

After reviewing the approved closure plan the Court concludes that Waybrant's assertions are in error. The plan requires that wastes be treated "at a licensed hazardous waste management facility that will render the waste acceptable for disposal in accordance with the land ban restrictions specified in 1988 40 C.F.R. § 268.33 and 268.40." Approved Closure Plan, Modification 12. According to the affidavit of Kathleen Clancy, an environmental engineer employed by the MDNR, this requirement includes provision for stabilization of the waste. Waybrant's testimony does not

identify which regulations now require stabilization or where the approved plan runs afoul of those regulations. The weight of the evidence, viewed in defendants' favor, establishes that the approved plan is in compliance with the applicable EPA regulations. Likewise, the plan makes no mention of the smelter in Canada.[8] There is no reason to believe that the plan cannot be fully implemented today.

In any event, defendants may propose amendments to the approved plan if the circumstances upon which the plan was based have changed. In fact, they are required to amend the plan if "unexpected events require a modification." 40 C.F.R. § 265.112(c). The Court is informed that an amended plan is being prepared or recently has been prepared by Waybrant. There are administrative processes outlined in RCRA through which these proposed amendments will be reviewed by the EPA. Currently though the only approved plan is the 1988 plan and it must be implemented as expeditiously as possible.[9]

### B. Provision of Financial Assurance

◼ Plaintiffs request that defendants be ordered to provide financial assurance for closure in accordance with 40 C.F.R. § 265.143. Defendants maintain that this relief is inappropriate because they are unable to comply and plaintiffs have an adequate remedy at law, namely, a money judgment for a sum certain.

---

8. Given several misstatements of fact contained in his affidavit, it is unclear whether Waybrant's testimony refers to the approved closure plan. Plaintiffs offer the theory that he is relying on PPP's proposed amendments which were received and rejected by the EPA in the fall of 1989. PPP never undertook an appeal from the rejection of these amendments, and so they are irrelevant at this point.

9. Defendants raise two additional objections to ordering closure of the Richland facility, neither of which has merit. First, they contend that their compliance with the state court order and inability to provide financial assurance are mitigating circumstances to consider in granting the appropriate relief. Although the Court determined in its May 14, 1990, opinion that these circumstance may be considered in fashioning the appropriate relief, at a minimum PPP and Ladney are strictly liable for closure of the facility. The Court cannot order the defendants

to do less than RCRA minimally requires. If mitigation is warranted, it may only be considered in assessing monetary fines and/or money damages at trial.

Second, defendants argue that providing financial assurance is a prerequisite to closure. Because they have not provided financial assurance they contend they cannot be compelled to close the facility. Defendants are in error. Although financial assurance is an important part of the RCRA's statutory and regulatory scheme, it is not a necessary prerequisite, either logically or within the Act's framework, to implementation of an approved closure plan. If the statute required otherwise, closure could easily be avoided by any defendant claiming to have inadequate funds. Congressional intent is clear that closure, not financial assurance, is the overriding concern of RCRA.

Viewing the totality of the evidence before it, the Court suspects that defendants are not being forthright in their assertion that they cannot provide financial assurance. They rely once again on the affidavit of Thomas Hinsberg as evidence of their inability to comply. It seems fair to say that if defendants had been acting in good faith for the past five years in attempting to comply with RCRA they could now present the Court with better evidence of their financial condition than a single affidavit which is admittedly untrustworthy and based on unsubstantiated statements of the defendants and their employees.

Still, the financial assurance requirement is secondary to the main goal of implementing the approved closure plan. Defendants are not required to provide financial assurance before they implement the plan. This provision is designed to guarantee that funds will be available to complete closure and ultimately post-closure maintenance in the event that defendants fail to fulfill their closure and maintenance obligations. Applying the Supreme Court's *Gambell* analysis and giving defendants the benefit of the doubt, it does not appear that an injunction is necessary on this issue at this time. The overriding purpose of RCRA is not to ensure that defendants provide financial assurance, so an injunction should not issue as a matter of course on this issue and the Court must undertake an equitable analysis. Based on the evidence presently before the Court there appears to be little threat of irreparable injury from failure to immediately provide financial assurance. After all, defendants are required to immediately implement the approved closure plan. The public interest will be protected by implementation of the closure plan and plaintiffs may have an adequate remedy at law in the form of a money judgment. This matter is scheduled for trial beginning on February 4, 1991, and at this time one of the main issues before the Court will be defendants' failure to provide financial assurance. The Court expects that defendants will come forward with more reliable evidence of their respective financial situations than they have presented at this juncture.

## C. Compliance With Liability Requirements

■ Plaintiffs also request that the Court order defendants to fulfill their liability requirements pursuant to 40 C.F.R. § 265.147. This issue is almost identical to the financial assurances issue discussed above. Although the Court is not satisfied with defendants' contention that they are not able to meet this responsibility, this requirement is not of the same urgency as the issue of closure. Again, plaintiffs may have an adequate remedy at law and based on the evidence presently before the Court a balance of the equities appears to weigh in defendants' favor. Resolution of this issue will await trial.

## D. Compliance With Groundwater Monitoring Requirements

■ Plaintiffs' final request is for an order compelling defendants to comply with RCRA's groundwater monitoring requirements pursuant to 40 C.F.R. Part 265 Subpart F. From the Court's previous finding of liability, it is clear that defendants are required to implement a groundwater monitoring system. Under an equitable analysis of the present situation the issuance of an injunction in favor of the plaintiffs would now be warranted except for an issue of fact that has yet to be resolved.

Defendants claim that an adequate groundwater monitoring and purge system was installed at the Richland facility this past year. Apparently this system was installed pursuant to a 1984 state court order arising out of earlier state court litigation. In support of this assertion defendants offer the affidavit testimony of Nathan B. Driggers, corporate counsel for PPP. He contends that the installed system was approved by the MDNR, and defendants imply in their brief (although they do not state outright) that the system satisfies RCRA. Although plaintiffs correctly argue that compliance with the state order does not excuse compliance with RCRA, it would be inequitable to order defendants to do duplicate work. Plaintiffs' basis for

their assertion that no groundwater maintenance system has yet been installed is a July 31, 1989, MDNR report. Given Driggers' affidavit asserting that a system was installed in 1990, questions of fact remain as to the existence of the system and its adequacy under RCRA. Plaintiffs do not rebut defendants' evidence that this new system has been installed and that it fulfills the RCRA requirements. Accordingly summary judgment on this issue is inappropriate.

## IV.

For the reasons stated above, plaintiffs' motion for partial summary is granted in part and denied in part. Plaintiffs are ordered to provide this Court with a detailed proposed Order granting a permanent injunction as to defendants' implementation of the 1988 approved closure plan and compliance with RCRA's closure provisions, in accordance with the foregoing opinion. The proposed Order should specify exactly what activities defendants are required to undertake and should incorporate the terms and timetable of the approved closure plan.