UNITED STATES of America

v.

**RICHLYN LABORATORIES, INC., a Corporation and Richard S. Weinberg, an Individual.**

**Civ.A. No. 92–CV–5464.**

United States District Court, E.D. Pennsylvania.

May 25, 1993.

David A. Garrison, U.S. Attorney's Office, Philadelphia, PA, Jacqueline H. Eagle, Dept. of Justice–Consumer Litigation, Washington, DC, David J. Horowitz, Asst. Chief Counsel for Enforcement, Food and Drug Admin., Rockville, MD, for plaintiff.

Joseph McHale, William J. Barker, Jr., Frederick J. Bosch, Jeffrey M. Lindy, Stradley, Ronon, Stevens & Young, Philadelphia, PA, for defendant.

## MEMORANDUM AND ORDER

JOYNER, District Judge.

This equity action is once again before the Court upon motion of the Plaintiff, United States of America for summary judgment and entry of a permanent injunction against the defendant pharmaceutical manufacturers preventing them from resuming their drug

manufacturing and shipping operations until the Food and Drug Administration (FDA) finds and notifies them that they are in compliance with all relevant federal laws and regulations and permanently enjoining them from placing adulterated or misbranded drugs into interstate commerce. After carefully reviewing the entire record in this matter, we find that summary judgment in Plaintiff's favor is appropriately entered at this juncture and the motion shall therefore be granted.

The pertinent facts underlying the instant action were succinctly stated in the Findings of Fact and Conclusions of Law rendered in our Decision dated October 1, 1992 granting Plaintiff's motion for preliminary injunctive relief and are now incorporated herein by reference. *See Generally:* Fed.R.Civ.P. 65(a)(2). Since that time, the Defendants have engaged the services of an FDA-approved consultant, Bernard T. Loftus, and the parties have engaged in additional dialogue and discovery primarily in the form of depositions. A hearing on the Defendant's motion to hold the Plaintiff in contempt of the orders of October 1 and November 5, 1992 was held before this Court on March 25, 1993, 817 F.Supp. 26, at which time additional evidence and testimony were produced. Thus, in addition to the factual findings contained in our Decision of October 1, 1992, we now make the following supplemental Findings of Fact.

## FINDINGS OF FACT

30. Pursuant to this Court's orders in this matter of October 1, 1992 and November 5, 1992, Defendants Richlyn Laboratories, Inc. and Richard Weinberg retained one Bernard T. Loftus as their expert consultant and inspector for compliance with CGMP regulations. Mr. Loftus was approved by the FDA as a consultant for purposes of the above-referenced court orders via letter dated October 26, 1992 signed by Jacqueline H. Eagle, Esquire, Office of Consumer Litigation, Civil Division, Department of Justice. (4/2/93, Affidavit of Bernard T. Loftus; Testimony of Bernard T. Loftus, 3/25/93).

31. On November 12, 1992, Mr. Loftus and Richard Weinberg met with Loren John-son, the Philadelphia District Director, Charles Thorne, Director of FDA's Philadelphia Compliance Branch and Compliance Officer Karyn Campbell Bowen to discuss Richlyn's proposal to resume packaging operations in accordance with this Court's preliminary injunction orders. At that time, Messrs. Weinberg and Loftus proposed and the FDA representative agreed that it was a good idea for Richlyn to work toward the resumption of its operations by developing a protocol for the manufacture and validation of one capsule product. (Testimony of Bernard T. Loftus, 3/25/93; Exhibit "E" to Plaintiff's Motion for Summary Judgment).

32. Approximately one month later on December 10, 1992, Richlyn Laboratories submitted its Validation Program and a draft copy of its Validation Protocol for diphenhydramine HCl capsules 25 mg. along with a certification statement from Mr. Loftus which indicated that the said programs would, if followed, comply with Section 501(a)(2)(B) of the Federal Food, Drug and Cosmetic Act, (21 U.S.C. § 351(a)(2)(B)) and the regulations under 21 C.F.R. 210 and 211. (Exhibits "E" and "K" to Defendants' Motion for Contempt; Exhibit "F" to Plaintiff's Motion for Summary Judgment). A completed draft of those documents, as well as a second certification statement from Mr. Loftus was submitted to FDA on December 18, 1992. (Exhibit "C" to Plaintiff's Motion for Summary Judgment).

33. Via correspondence dated December 31, 1992, Charles Thorne responded on behalf of FDA to Richlyn's proposed programs and protocols. While he did not categorically reject Richlyn's submissions as inadequate, Mr. Thorne did raise a number of questions concerning the protocol's ability to ensure the manufacture of diphenhydramine HCl that consistently met its pre-determined specifications and quality characteristics. (Exhibit "H" to Plaintiff's Motion for Summary Judgment).

34. Mr. Weinberg thereafter responded to the December 31, 1992 letter on January 7, 1993 by attaching a copy of a response from Mr. Loftus in which he disagreed with many of the FDA's comments, observations and interpretations of the CGMP regulations

as they should have been applied to Richlyn's protocol. Mr. Weinberg further advised the government that since Mr. Loftus had certified that the protocol for diphenhydramine HCl capsules 25 mg. was acceptable and that Richlyn was able to manufacture the product, Richlyn "intend[ed] to resume manufacturing immediately." Mr. Weinberg also informed FDA that the Defendants had advised the Center for Disease Control and the Office of Generic Drugs that they were prepared to promptly manufacture batches of sulfadiazine tablets for use in the treatment of AIDS-related diseases. (See Exhibit "I" to Plaintiff's Motion for Summary Judgment).

35. Following several telephone conferences and exchange of correspondence between the parties concerning Richlyn's immediate readiness to resume manufacturing diphenhydramine for purposes of fulfilling a contract with a Defense Department contractor, a limited FDA acceptance inspection of Richlyn's facility was scheduled at Defendant's request for January 19–20, 1993. (See Exhibit "K" to Plaintiff's Motion for Summary Judgment).

36. At the conclusion of the inspection on January 20, 1993, Mr. Weinberg was presented with a two-page FDA Form 483 Notice of Inspectional Observations which contained some nine observations of deficiencies in, among other things, Richlyn's proposed record-keeping procedures, specifications and standard operating procedures as well as in its manufacturing facilities and laboratory. (Exhibit "L" to Plaintiff's Motion for Summary Judgment).

37. With respect to the physical condition of Richlyn's laboratory and manufacturing facilities, the FDA inspectors found overhanging pipes, dirt and dust in the area of the hanging fluorescent lights, excess equipment in the open blending area and no primary dust control system for the 20 cubic foot blender. In addition, the inspector found incomplete partitions between the blending and wash and weighing areas, missing or loose ceiling tiles in the milling area and no humidity control in the encapsulation room other than an air conditioner. Neither Mr. Weinberg nor Mr. Loftus dispute that these conditions existed at the time of the January, 1993 inspection. (Exhibits "L" and "M" to Plaintiff's Motion for Summary Judgment; Testimony of Bernard T. Loftus and Henry Avallone, 3/25/93).

38. Richlyn Laboratories now has limited resources, financial and otherwise, as a result of the imposition of the preliminary injunction on October 1, 1992. (Exhibit "M" to Plaintiff's Motion for Summary Judgment).

39. Although the Defendants responded to the January, 1993 FDA 483 by indicating a sincere interest in correcting the violations, they took exception to the government's concerns about the physical condition of the company's plant and the government's implication that the diphenhydramine protocol did not satisfy CGMP requirements. (Exhibit "M" to Plaintiff's Motion for Summary Judgment; Testimony of Bernard T. Loftus and Henry Avallone, 3/25/93).

## DISCUSSION

Under Fed.R.Civ.P. 56(c), summary judgment is properly entered "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In resolving a summary judgment motion then, the court must look beyond the bare allegations of the pleadings to determine if they have sufficient factual support to warrant their consideration at trial. *Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d 1287 (D.C.Cir.1988), *cert. denied,* 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988); *Aries Realty, Inc. v. AGS Columbia Associates,* 751 F.Supp. 444 (S.D.N.Y.1990).

Generally speaking, the party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In considering a summary judgment motion, the court must view

the facts in the light most favorable to the party opposing the motion and all reasonable inferences from the facts must be drawn in favor of that party as well. *U.S. v. Kensington Hospital,* 760 F.Supp. 1120 (E.D.Pa. 1991); *Schillachi v. Flying Dutchman Motorcycle Club,* 751 F.Supp. 1169 (E.D.Pa. 1990).

This is not to say, however, that a non-movant may rest upon the allegations contained in his or her pleadings in defense of a summary judgment motion. *See: Allen v. Denver Public School Board,* 928 F.2d 978 (10th Cir.1991). Indeed, Fed.R.Civ.P. 56(e) provides:

> "When a motion for summary judgment is made and supported as provided for in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."

In other words, the burden of demonstrating the absence of genuine issues of material fact is initially on the moving party regardless of which party would have the burden of persuasion at trial. Following such a showing, the non-moving party must present evidence through affidavits or depositions and admissions on file which comprise of a showing sufficient to establish the existence of every element essential to that party's case. *Celotex Corp. v. Catrett, supra,* 477 U.S. at 321–325, 106 S.Ct. at 2552–2553; *Keyes v. National Railroad Passenger Corp.,* 756 F.Supp. 863 (E.D.Pa.1991); *Applications Research Corp. v. Naval Air Development Center,* 752 F.Supp. 660 (E.D.Pa.1990).

■ It is well-settled that the power to grant a permanent injunction rests with the sound discretion of the trial court which may, in turn, grant a permanent injunction after a hearing if there are no material issues of fact and the issues of law have been correctly resolved. *Clark v. Cohen,* 613 F.Supp. 684, 690 (E.D.Pa.1985), *aff'd,* 794 F.2d 79 (3rd Cir.1986), *cert. denied,* 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 404 (1986). Permanent injunctive relief is appropriate if (1) plaintiff is successful in proving the merits of its case; (2) there is no available remedy at law; and (3) the balance of equities favors granting such relief. *Ciba–Geigy Corp. v. Bolar Pharmaceutical Co.,* 747 F.2d 844, 850 (3rd Cir.1984) *cert. denied,* 471 U.S. 1137, 105 S.Ct. 2678, 86 L.Ed.2d 696 (1985); *Travellers International AG v. Trans World Airlines, Inc.,* 722 F.Supp. 1087, 1096 (S.D.N.Y.1989). However, it has been held that when the plaintiff is a governmental entity or private attorney general, and the activity may endanger public health, injunctive relief is proper without undertaking a balancing of the equities. *Sierra Club v. United States Department of Energy,* 770 F.Supp. 578, 582–583 (D.Colo.1991); *United States v. Production Plated Plastics, Inc.,* 762 F.Supp. 722, 728 (W.D.Mich.1991). Similarly, it has also been held that an evidentiary hearing is not always required before a permanent injunction can be issued. Rather, when the evidence presented by affidavit and other documentation clearly establishes the plaintiff's right to an injunction, a hearing need not be conducted. *Id.,* at 729 citing, *inter alia, American Can Co. v. Mansukhani,* 814 F.2d 421, 425 (7th Cir.1987); *McCarthy v. Briscoe,* 429 U.S. 1317, 1324, 97 S.Ct. 10, 14, 50 L.Ed.2d 49 (1976).

As was discussed in this Court's Memorandum and Order of October 1, 1992, the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 331 expressly prohibits:

(a) The introduction or delivery for introduction into interstate commerce of any food, drug, device or cosmetic that is adulterated or misbranded.

(b) The adulteration or misbranding of any food, drug, device or cosmetic in interstate commerce.

(c) The receipt in interstate commerce of any food, drug, device or cosmetic that is adulterated or misbranded and the delivery, or proffered delivery thereof for pay or otherwise.

(d) The introduction or delivery for introduction into interstate commerce of any article in violation of section 344 or 355 of this title.

21 C.F.R. Part 210 entitled "Current Good Manufacturing Practice in Manufacturing, Processing, Packing or Holding of Drugs; General" in turn provides, at § 210.1(b):

"The failure to comply with any regulation set forth in this part and in parts 211 through 226 of this Chapter in the manufacture, processing, packing or holding of a drug shall render such drug to be adulterated under section 501(a)(2)(b) of the [FDC] Act and such drug, as well as the person who is responsible for the failure to comply shall be subject to regulatory action."

Similarly, 21 U.S.C. § 351(a)(2)(B) states that:

"A drug or device shall be deemed to be adulterated ... (B) if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identify and strength and meets the quality and purity characteristics which it purports or is represented to possess ..."

■ Again, as we observed at the preliminary injunction stage, it is a requirement under Current Good Manufacturing Practices that every drug manufacturer and/or processor develop and follow detailed, written procedures for all aspects of the production, testing, storage, labeling and distribution of any and all of its drug products. *See Generally:* 21 C.F.R. §§ 211.80, 211.100, 211.101, 211.110, 211.113, 211.115, 211.122, 211.125, 211.130, 211.142, 211.150, 211.166. The regulations further specify in clear and unambiguous language what information these written procedures must include and the areas which they must cover as well as the manner in which they are to be followed. In this manner, the regulations are obviously designed to apply to any person or entity that is engaged in the drug manufacturing, processing, labeling, etc. business. *See, e.g.:* 21 C.F.R. §§ 210.1, 211.1. Regular and continuing training of all employees and personnel in current good manufacturing practices by qualified individuals is also expected. 21 C.F.R. 211.25.

In addition, the CGMP Regulations contemplate that drug producers and manufacturers will conduct stability testing of several batches of each of their products at regular intervals and in accordance with their written programs and that they will make and maintain detailed and accurate written records of all tests run. 21 C.F.R. § 211.166.

Finally, the regulations mandate that any building(s) used in the manufacture, processing, packing or holding of drug products be constructed and maintained in such a way as "to prevent mix-ups between different components, drug product containers, closures, labeling, in-process materials or drug products and to prevent contamination." 21 C.F.R. § 211.42. Adequate ventilation is to be provided and air filtration systems are to be used when appropriate on air supplies to production areas. If air is recirculated to production areas, measures must be taken to control recirculation of dust from production. 21 C.F.R. § 211.46.

At bar, after reviewing all of the evidence presented at both the preliminary injunction and contempt hearings and that provided in support of and in opposition to the instant motion in the light most favorable to the Defendants, we find that Plaintiff has met its burden of proving entitlement to permanent injunctive relief. While we recognize that Defendants may be somewhat understandably confused by the fact that the CGMP regulations do not specify precisely what a protocol should be with respect to the manufacture of a particular drug product or as to exactly how much dust may be acceptable to an FDA investigator who is looking for a danger of cross-contamination, we note that the Defendants do not dispute that the FDA inspectors found dusty conditions, overhanging pipes, loose or missing ceiling tiles and an excess wooden platform in the tablet compressing and milling area during the April and June, 1992 and January, 1993 inspections. Nor do Defendants contest, among other things, that the only humidity control in the encapsulation room at the time of the January, 1993 inspection was an air conditioner or that there were no written standard

operating procedures in place for cleaning the manufacturing facilities and equipment or for the weighing of the components.[1] In short, the record in this matter reveals that at the time the FDA conducted its limited acceptance inspection for purposes of determining Richlyn's ability to begin manufacturing diphenhydramine HCl 25 mg capsules, only the protocol for the manufacture of that product was in place.[2] No other corrections of the numerous CGMP violations that we found to have existed at the time of our entry of the October 1, 1992 Decision and Order have yet been made, although there is evidence that Defendants have been trying to make those corrections which they believe are necessary to bring their facility into compliance with the FDC Act and the CGMP regulations.

While we respect and encourage the Defendants to continue in their efforts to bring the defendant company into compliance, we nonetheless can reach no other holding but that the Plaintiff has indeed proven the merits of its case i.e., that Defendants violated and will in all likelihood continue to violate the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 351, *et seq.* and the Current Good Manufacturing Practices set forth in 21 C.F.R. Parts 210 and 211 by manufacturing and shipping adulterated drug products in interstate commerce. Reiterating the findings in our October 1, 1992 Decision, it is clear that the only adequate solution which exists to rectify the harm caused and again threatened to the public health, safety and welfare by such violations is the equitable remedy afforded by an injunction. Accordingly, the preliminary injunction entered in this matter on October 1, and subsequently amended on November 5, 1992 shall essentially be converted into one which is permanent in nature.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter and the parties to this action pursuant to 21 U.S.C. § 332(a) and 28 U.S.C. §§ 1331, 1337 and 1345.

2. The Defendants' drug manufacturing, processing and labeling operations are inadequate and fail to satisfy and comply with the standards established in the Food and Drug Administration's Current Good Manufacturing Practice Regulations (21 C.F.R. § 210.1 *et seq.*) for validation, stability testing and prevention of cross-contamination.

3. The Defendants have introduced adulterated drug products into the stream of interstate commerce in violation of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 331.

4. There is a reasonable likelihood that the Defendants will continue to manufacture and place adulterated drug products in interstate commerce and thereby violate the Federal Food, Drug, and Cosmetic Act in the future if they are not now permanently enjoined from doing so.

5. The continued protection and introduction of adulterated drug products into interstate commerce poses a serious threat to the public health, safety and welfare.

6. The Plaintiff has proven the merits of its case.

7. No adequate remedy exists at law to protect the public health, safety and welfare from the threat posed by the Defendants' introduction of adulterated drugs and drug products into the stream of interstate commerce.

---

1. Rather, it is the *significance* which the FDA attached to these findings and whether they constitute violations of CGMP's which Defendants seek to challenge by directing the Court's attention to the deposition testimony of Investigators King and Cherry and Compliance Officer Bowen. Inasmuch as the legal standards governing the entry of summary judgment requires that material *facts* remain in dispute before such a motion can be defeated, Defendants' arguments in opposition to the instant motion fail. It is for this Court to judge whether the facts referenced above equate a violation of the Food, Drug and Cosmetic Act and the CGMP regulations. *See, e.g. Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

2. In fact, as Bernard Loftus testified at the contempt hearing on March 25, 1993, he has yet to oversee the clean-up of Richlyn's laboratory and manufacturing facilities before he can certify and the defendant company can re-commence its operations. Nevertheless, Defendants represented in their January 7, 1993 response that they intended to immediately resume manufacturing.

8. The issuance of a permanent injunction enjoining the Defendants from manufacturing, processing, packaging and distributing their drug products until such time as they are in full compliance with Current Good Manufacturing Practices and the Federal Food, Drug, and Cosmetic Act is the only appropriate remedy available to safeguard and protect the public health, safety and welfare.

An appropriate order follows.

## ORDER

AND NOW, this 25th day of May, 1993, upon consideration of Plaintiff's Motion for Summary Judgment, Defendants' opposition thereto and all of the evidence of record, and it appearing to the Court that a permanent injunction is appropriately issued at this time, it is hereby ORDERED that the said motion is GRANTED and the Defendants, Richlyn Laboratories, Inc., a corporation and Richard S. Weinberg, an individual and each and all of their officers, agents, servants, employees and any and all persons in active concert with them or any of them are hereby permanently restrained and enjoined from:

(A) Directly or indirectly doing or causing the introduction or delivery for introduction into interstate commerce of any drug whose labeling is false or misleading in any particular.

(B) Directly or indirectly doing or causing the introduction or delivery for introduction into interstate commerce of any drug which is manufactured, processed, packed, or labeled at Defendants' facilities in Philadelphia, Pennsylvania and manufacturing, processing, packing, or labeling any drug while held for sale after shipment of one or more of its components in interstate commerce, unless and until all of the following conditions have been met:

(1) The methods used in, and the facilities and controls to be used for manufacturing, processing, packing, labeling, and holding any drug, are established, operated, and administered in compliance with 21 U.S.C. § 351(a)(2)(B) and all Current Good Manufacturing Practice ("CGMP") Regulations for drugs, 21 C.F.R. Parts 210 and 211.

(2) The Defendants select a person subject to the approval of the Food and Drug Administration ("FDA") who, by reason of training and experience, is qualified to make inspections of drug manufacturing facilities to determine that the methods, facilities, and controls are operated and administered in compliance with 21 U.S.C. § 351(a)(2)(B) and 21 C.F.R. Parts 210 and 211, and such person:

(a) inspects the Defendants' manufacturing facilities and manner of operating, and certifies to FDA, in writing that the firm is in compliance with 21 U.S.C. § 351(a)(2)(B) and 21 C.F.R. Parts 210 and 211; and

(b) examines all drugs and components manufactured, processed, packed, and held at the Defendants' plant and certifies in writing to FDA that such drugs were manufactured, processed, and packed in accordance with 21 U.S.C. § 351(a) and 21 C.F.R. Parts 210 and 211.

(3) FDA notifies the Defendants in writing that the Defendants appear to be in compliance with 21 U.S.C. § 351(a)(2)(B) and 21 C.F.R. Parts 210 and 211.

(C) FDA may require the destruction of any product that either the consultant or FDA determines was manufactured, processed, packed, labeled or held in violation of 21 U.S.C. § 351(a)(2)(B) or 21 C.F.R. Parts 210 or 211. Such destruction shall be accomplished by the Defendants under FDA supervision, the costs of which shall be borne by the Defendants. Alternatively, FDA may, in its discretion, permit the Defendants to attempt to recondition such products under FDA supervision, the costs of which shall be borne by the Defendants pursuant to the rates set forth in Paragraph E of this Order.

(D) After the consultant has submitted the certifications required in ¶¶ (B)(2)(a) and (b), the consultant shall conduct subsequent audit inspections at least two times a year for a period of five years from the date of entry of this Order to ensure that the Defendants' facilities remain in compliance with all of the requirements set forth in 21 C.F.R. Parts 210 and 211. The consultant shall prepare a written report on the Defendants' facilities

and their operation at the conclusion of each audit inspection. The Defendants shall submit copies of the written audit reports to FDA and shall make these audit reports available, upon request, to duly authorized FDA representatives during the course of an FDA inspection conducted under the terms of this Order or pursuant to the authority of 21 U.S.C. § 374.

(E) The Defendants shall reimburse FDA for the costs of all FDA inspections, supervision, analyses, and examinations that FDA deems are necessary to evaluate the Defendants' compliance with this Order, as follows: at a rate of $45.00 per hour or fraction thereof per representative for inspection work; $52.00 per hour or fraction thereof per hour or fraction thereof for analytic work, and 25 cents per mile for travel expenses. Any drugs found not in compliance with CGMP shall be destroyed or otherwise brought into compliance, under FDA supervision, paid by the Defendants at the rates set forth above.

(F) After resumption of operations pursuant to Paragraph B of this Order, the Defendants shall immediately cease and discontinue manufacturing, packing, labeling, and distributing any articles of drug if, based on the results of an inspection or on the analysis of samples, FDA notifies the Defendants in writing that the Defendants' methods, facilities, and controls for manufacturing, packing and storing articles of drug are not established, operated, or administered in compliance with 21 U.S.C. § 351(a)(2)(B) and 21 C.F.R. Parts 210 and 211. Any cessation of operations as described above shall commence upon the receipt by any Defendant of FDA's notification and shall continue until the receipt by the Defendants of written notification by FDA that the Defendants appear to be in compliance with 21 U.S.C. § 351(a)(2)(B) and 21 C.F.R. Parts 210 and 211.

(G) The Defendants shall notify the Director, Philadelphia District Office, at least 10 days before any change in ownership or character of their business, such as dissolution, assignment, or sale resulting in the emergence of a successor corporation, the creation or dissolution of subsidiaries, or any other change in the Defendants' corporate structure, or the sale or assignment of any business assets, such as buildings, equipment, or inventory, that may affect compliance with this Order. The Defendants shall provide a copy of this Order to any successor or assignee prior to any sale, assignment, or other change that may affect compliance with this Order.

(H) This Court retains jurisdiction of this action for the purpose of modifying this decree and for the purpose of granting such additional relief as may be necessary or appropriate.