UNITED STATES of America, Plaintiff,

v.

POWER ENGINEERING COMPANY, Redoubt, Ltd., and Richard J. Lilienthal, Defendants/Third Party Plaintiffs,

v.

Jack LILIENTHAL, Third Party Defendant.

Civil Action No. 97–B–1654.

United States District Court, D. Colorado.

June 10, 1998.

John N. Moscato, Environmental Enforcement Section, Environment & Natl. Resources Div., U.S. Dept. of Justice, Denver, CO, Linda A. Surbaugh, Assistant U.S. Attorney, Denver,· CO, Thomas E. Sitz, Enforcement Attorney, U.S. Environmental Protection Agency, Region VIII, Denver, CO, for Plaintiff.

John R. McBride, John J. Zodrow, Zodrow, et al., P.C., Denver, CO, for Defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Plaintiff, the United States of America (the "United States"), acting on behalf of the United States Environmental Protection Agency (the "EPA"), pursuant to Fed. R.Civ.P. 65 and section 3008(a)(1) of the Resource Conservation and Recovery Act of 1976 ("RCRA"), as amended, 42 U.S.C. § 6928(a)(1) (1994 & Supp.1997), seeks a preliminary injunction directing the defendants, Power Engineering Company ("PEC"), Redoubt, Ltd. ("Redoubt"), and Richard Lilienthal ("Lilienthal"), to comply with state regulations adopted by the Colorado Department of Public Health and Environment (the "CDPHE"), found at 6 COLO. CODE REGS. 1007–3 § 266. These regulations require owners and operators of all hazardous waste facilities to document that they have secured the resources required to close their facilities in an appropriate and safe manner, and to pay third-party claims that may arise from its operations.

The United States commenced this action on August 1, 1997, alleging eight claims: (1) treatment of hazardous waste without a permit or interim status; (2) disposal of hazardous waste without a permit or interim status; (3) shipment of hazardous waste to an unpermitted facility; (4) improper container management; (5) storage of hazardous waste without a permit or interim status; (6) failure to provide employee training; (7) failure to have a hazardous waste contingency plan; and (8) illegal operations (failure to have a groundwater monitoring program, failure to have a closure plan, failure to minimize releases of hazardous waste, and failure to obtain and provide financial assurances for closure and post-closure). The United States also alleges that Power Engineering has failed to comply with CDPHE's Administrative Compliance Order.

As discussed on the record, this is an "overfile" action, indicating that the EPA is displeased with the manner in which the CDPHE has sought enforcement of federal and state regulations. The United States, therefore, at the request of the EPA, exercises its authority to seek defendants' compliance with Colorado hazardous waste regulations. Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331 (1994) and venue is proper pursuant to 28 U.S.C. §§ 1391(b), 1391(c), and 1395(a). A hearing was held beginning May 11, 1998. Based on the evidence presented and for the reasons

set forth below, I grant the United States' motion for preliminary injunction.

## I. STATUTORY AND REGULATORY GUIDELINES

RCRA is a comprehensive environmental statute designed to protect the public health and environment by ensuring the proper handling of solid and hazardous wastes. 42 U.S.C. § 6902(a). RCRA regulates the generation, treatment, storage, transportation, and disposal of solid and hazardous wastes. *See* 42 U.S.C. §§ 6922–6925. This comprehensive regulatory scheme is frequently described as "cradle-to-grave" oversight. *See Sierra Club v. United States Dept. of Energy,* 770 F.Supp. 578, 579 (D.Colo.1991); *see also* H.R.Rep. No. 96–1016, at 17 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6119, 6120.

Hazardous waste is tracked and regulated from the point of generation, through storage, transportation, and treatment, and to the point of ultimate disposal. The intent of this regulatory scheme is to minimize the potential for public health and environmental problems resulting from improper management of hazardous waste. The potential for public health and environmental problems, including hazards associated with fire, explosion, direct contact, and contamination of air, surface water, and groundwater resulting from inadequate management is well-documented. *See, e.g.,* H.R.Rep. No. 94–1491, at 17–24 (1976), *reprinted in* 1980 U.S.C.C.A.N. 6238, 6254–6261 (documenting hazardous waste tragedies in several states).

Owners and operators of hazardous waste facilities must establish and maintain financial assurances for proper closure and, if necessary, post-closure care of the facility, as well as liability insurance for bodily injury and property damage to third parties resulting from sudden and accidental occurrences at the facility. 6 COLO. CODE REGS. 1007–3 § 266; 40 C.F.R. § 265. These financial responsibility requirements ensure that funds are available for proper closure and, if necessary, post-closure care of the facility.

As enacted in 1976, RCRA required two types of hazardous waste facilities to provide financial assurances: (1) those with final operating permits; and (2) those with "interim status" that had applied for final operating permits. Congress deemed it impractical to halt all hazardous waste activity pending the issuance of permits. Congress, therefore, created interim status, allowing the EPA to treat existing facilities with pending permit applications as having been issued a permit. 42 U.S.C. § 6925(e)(1); *United States v. T & S Brass and Bronze Works, Inc.,* 681 F.Supp. 314, 316 (D.S.C.) *aff'd in part, vacated in part,* 865 F.2d 1261 (4th Cir.1988).

A facility in existence on November 19, 1980 could obtain interim status by notifying the EPA of its activities and submitting a Part A permit application. 42 U.S.C. § 6925(e)(1); 40 C.F.R. §§ 265.1(b), 270.10(e). The Part A application contains information concerning the nature of the applicant's business, a scale drawing, photographs and a topographic map of the facility, a description of its hazardous waste management processes and the design capacity of these processes, a specification of the types and quantities of hazardous wastes processed, stored, or disposed of at the facility, as well as information regarding permits or construction approvals. 40 C.F.R. § 270.14. A facility operating pursuant to interim status is limited to the types of wastes and procedures specified in the Part A application and the facility must comply with the operating standards of 40 C.F.R. § 265, which include the provision of financial assurances.

In 1984, primarily because of widespread industry noncompliance, Congress amended RCRA to provide that all interim status facilities would lose their interim status unless they certified by November 8, 1985, that they complied with all applicable groundwater monitoring and financial responsibility requirements. Hazardous and Solid Waste Amendments of 1984, P.L. No. 98–616, 98 Stat. 3221, codified at 42 U.S.C. § 6925(e)(2) (Supp. II 1984). Upon losing interim status, the facility must have immediately ceased its hazardous waste management operations and, within fifteen days, submitted a closure plan for approval by the state or the EPA. 42 U.S.C. § 6925(a); 40 C.F.R. § 265.112(d)(3)(i). The facility must have begun final closure within ninety days of approval of that closure plan and achieved closure within 18 days of approval of the closure

plan, unless the state or the EPA allowed an extension of the closure period. 40 C.F.R. § 265.113.

Closure of a hazardous waste facility must be performed in a manner that:

(a) Minimizes the need for further maintenance, and

(b) Controls, minimizes or eliminates, to the extent necessary to protect human health and the environment, post-closure escape of hazardous waste, hazardous constituents, leachate, contaminated run-off, or hazardous waste decomposition products to the ground or surface waters or to the atmosphere, and

(c) Complies with the closure requirements of [other regulations promulgated under RCRA].

40 C.F.R. § 265.111. Even after closure has been completed, the owner or operator may be required to maintain post-closure care of the facility for a period of thirty years. 40 C.F.R. § 265.117. Thus, RCRA provides for extensive regulation of a hazardous waste facility long after the facility has stopped operating. See American Iron & Steel Institute v. U.S. EPA, 886 F.2d 390, 393 (D.C.Cir. 1989) ("While invariably described as a 'cradle-to-grave' system, [RCRA] in fact reaches ... well beyond the grave.").

In an effort to secure enforcement of RCRA's provisions to the fullest extent possible, Congress conferred enforcement power upon the EPA, as well as federally authorized state agencies and United States citizens. RCRA allows states to implement their own programs in lieu of the federal program if the state's program is "equivalent to" and "consistent with" the federal program and provides for "adequate enforcement of compliance." 42 U.S.C. § 6926(b).

The EPA delegated to the State of Colorado authorization to operate a federally authorized hazardous waste program. See, generally, 49 Fed.Reg. 41036 (Oct. 19, 1984); 54 Fed.Reg. 20847 (May 15, 1989); 56 Fed.Reg. 21601 (May 10, 1991). Colorado has promulgated regulations, pursuant to the Colorado Hazardous Waste Management Act ("CHWMA"), C.R.S. § 25–15–302(2) and (3), that specifically govern generators of hazardous waste and the operation and maintenance of hazardous waste treatment, storage, and disposal facilities. 6 COLO. CODE REGS. 1007–3 §§ 262, 264–268. Any action taken by the State of Colorado pursuant to its federally authorized hazardous waste program "shall have the same force and effect as action taken by the [EPA]." 42 U.S.C. § 6926(d).

The EPA, however, retains the right to bring enforcement actions compelling compliance with Colorado's hazardous waste regulations. 42 U.S.C. §§ 6928, 6934, and 6973; accord 49 Fed.Reg. 41036 (Oct. 19, 1984); 51 Fed.Reg. 37729 (Oct. 26, 1986); 54 Fed.Reg. 20847 (May 12, 1989); 56 Fed.Reg. 21601 (May 10, 1991); 59 Fed.Reg. 16568 (April 7, 1994). Whenever the EPA determines that a violation of RCRA has occurred, the EPA ".. may commence a civil action in the United States district court in the district in which the violation occurred for appropriate relief, including a temporary or permanent injunction." 42 U.S.C. § 6928(a)(1).

## II. PRELIMINARY INJUNCTION STANDARDS

■ Because a preliminary injunction is an extraordinary remedy, "the right to relief must be clear and unequivocal." SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1098 (10th Cir.1991). Preliminary injunctions that preserve the status quo pending a trial on the merits are known as "prohibitory" injunctions. Injunctions that disturb the status quo, by requiring some affirmative act, are denominated "mandatory" injunctions. Because mandatory injunctions are more burdensome than prohibitory injunctions, the plaintiff must demonstrate entitlement to the injunction by compelling evidence. Visa, 936 F.2d at 1099. This heightened evidentiary burden must also be met when the issuance of the injunction would provide the plaintiff with substantially all the relief that would be available following success on the merits. Phillip v. Fairfield Univ., 118 F.3d 131, 133 (2d Cir.1997).

A court passing judgment on a motion for preliminary injunction considers whether plaintiff establishes that: (1) it will suffer irreparable injury unless an injunction is issued; (2) its threatened injury outweighs any harm the proposed injunction may cause to the opposing party; (3) it will likely prevail

on the merits of the litigation; and (4) an injunction, if issued, would not be adverse to the public interest. *Chemical Weapons Working Group, Inc. v. United States Dept. of the Army,* 111 F.3d 1485, 1489 (10th Cir. 1997) (citation omitted); *accord Visa,* 936 F.2d at 1098; *United States ex rel. Citizen Band Potawatomi Indian Tribe of Oklahoma v. Enterprise Management Consultants, Inc.,* 883 F.2d 886, 888–889 (10th Cir. 1989).

■ Normally, the most important equitable factor is irreparable harm. When a case is brought pursuant to an environmental or public health statute, however, the primary focus shifts from irreparable harm to concern for the general public interest. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982); *accord Environmental Defense Fund, Inc. v. Lamphier,* 714 F.2d 331, 337–338 (4th Cir.1983); *Wilson v. Amoco Corp.;* 989 F.Supp. 1159, 1171 (D.Wyo.1998) (citations omitted). A plaintiff seeking injunctive relief, however, still must demonstrate irreparable harm in the absence of express Congressional intent to the contrary. *Wilson,* 989 F.Supp. at 1171 (citing *Romero–Barcelo,* 456 U.S. at 312, 102 S.Ct. 1798). Based on these established standards, I will apply the traditional equitable factors, as modified for RCRA, and weigh more heavily the general public's interest in the issuance of the injunction. Because the United States seeks a mandatory injunction, however, it bears the burden of showing that the four factors, when balanced, weigh compellingly in its favor.

### III. FINDINGS OF FACT

The following findings of fact are based upon the stipulations of the parties and the evidence presented at the hearing. These findings of fact apply only to the United States' motion for preliminary injunction.

Both PEC and Redoubt are Colorado corporations. PEC operates a metal refinishing business located at 2525 South Delaware Street in Denver, Colorado ("the Facility"). Redoubt owns the land and buildings leased to PEC. Lilienthal is the president of PEC and owns 51% of the outstanding stock of both PEC and Redoubt. The Lilienthal Family Trust owns the remaining minority interests of both PEC and Redoubt. Lilien-

thal is now, and has been, involved in making management decisions for PEC and Redoubt, including decisions regarding environmental compliance. (Stip.¶¶ 6–9.)

PEC's business consists primarily of refinishing metal crankshafts, connecting rods, and rod journals for large diesel engines used in heavy equipment. PEC's metal refinishing process includes stripping, preparation of the surface for refinishing, and chrome-plating. As a result of PEC's operations, the Facility produces more than 1,000 kilograms per month and stores more than 6,000 kilograms per month of "hazardous waste" as that term is defined by 6 COLO. CODE REGS. 1007–3 § 261.3. The Facility generates approximately thirteen different "waste streams" including, but not limited to, arsenic, lead, mercury, and hexavalent chromium contaminated media that exceed established regulatory toxicity standards. Hexavalent chromium is a corrosive hazardous waste and known carcinogen. CONDENSED CHEMICAL DICTIONARY at 249 (10th ed.1981).

In 1992, Denver Health and Hospitals contacted the CDPHE concerning a discharge into the Platte River of high levels of hexavalent chromium. Denver Health and Hospitals had investigated all of the businesses in the area and determined that PEC was the likely source of that discharge. The CDPHE then conducted compliance review inspections at the Facility on August 3, 1992, September 3–4, 1992, September 25, 1992, February 23, 1993, and March 10, 1993. (Stip. ¶ 18; Ex. 1 at 15–16.) During these inspections, the CDPHE inspector observed and reported numerous violations of Federal and Colorado regulations governing treatment, storage, and disposal of hazardous waste. The inspector communicated the nature of these violations to PEC's representative. (Ex. 1 at 101, 110–111, 130–131, 132–134, and 139–140.) As a result of these inspections, the CDPHE prepared "Notice of Inspection" reports, signed by the CDPHE inspector and PEC's representative. Based on the stipulations and evidence from the hearing, I find that PEC is guilty of numerous violations of Colorado hazardous waste regulations.

While many of the violations occurred in the past, some violations continue.

### a. Illegal Treatment, Disposal, and Storage of Hazardous Waste

PEC has never filed a Part A notification, a Part B permit application, received an EPA or State of Colorado permit, or attained interim status for the treatment, storage, or disposal of hazardous waste. (Stip.¶ 42.) Michael Hansen, PEC's Environmental Manager, testified that, after the CDPHE informed PEC in 1993 that its storage and disposal of hazardous waste without a permit violated federal and state regulations, "We looked up part B and saw that was too much for us to do." PEC concedes, however, that it engaged in treatment, storage, and disposal of hazardous waste.

#### 1. *Treatment*

On August 3, 1992, a CDPHE inspector notified PEC that its placement of electrostripping and plating waste into an evaporation unit and an annealing oven at the Facility constituted treatment of hazardous waste without obtaining a permit or Interim Status from the EPA or the State of Colorado. PEC utilized the evaporation unit (Exs.11–12) and the annealing oven to "dewater" and recover chrome waste. (Stip.¶¶ 20–22.) Approximately thirty-days after the August 3, 1992 inspection, PEC closed the evaporation unit pursuant to a plan submitted to and approved by the CDPHE. (Stip.¶ 66.) The annealing oven, however, was not closed pursuant to a closure plan submitted to and approved by the CDPHE. Rather, the annealing oven was dismantled and sold for scrap metal by PEC in 1992. The evidence shows that, when PEC closed its annealing oven and evaporator in 1992, it ceased "treatment" of hazardous waste as that term is defined by 6 COLO. CODE REGS. 1007-3 § 260.10. The United States concedes that, based on the limited information available from its files and a site review conducted on April 2, 1998, PEC is not currently treating waste. (Stip.¶ 67.)

#### 2. *Disposal*

From 1978 to 1992, hazardous waste leaked into the soil beneath the Facility's 17 chrome-plating tanks. (Stip. ¶ 26; Exs. 3, 4.)

The plating tanks are located inside the Facility's main building. As originally installed and used, the plating tanks were composed of steel with PVC lining, situated on a floor of earth and timber or within a concrete pit. Beginning in 1985 and concluding in 1994, PEC installed additional containment structures underneath the plating tanks.

During installation of these additional containment structures, PEC excavated some, but not all, of the soil beneath plating tanks. Although PEC knew that the soil was discolored by chrome contamination, PEC did not investigate the precise toxicity of the soil or ascertain the quantity of contaminated soil. PEC placed some of the excavated soil into three open waste piles on land adjacent to the Facility's main building. (Answer ¶ 24; Stip. ¶ 27; Exs. 7–10.) Two of the piles exist on land owned by Redoubt and the third pile was placed on adjacent land owned by the Atchison, Topeka & Santa Fe Railroad. These three waste piles remain there today. (Answer ¶ 24; Stip. ¶ 27.) PEC placed the remainder of excavated soil into fifty-five gallon drums (Ex. 16), which PEC eventually shipped to a permitted waste disposal facility in 1993.

PEC utilizes "air scrubbers," also known as "air misters," installed in 1978, to draw air from above the plating baths located inside the Facility's main building. The air-cleansing process causes hexavalent chromium, lead, mercury, and arsenic to condense in aqueous form inside the ducts located outside the Facility's main building. On June 19, 1992, PEC obtained initial approval from the CDPHE for an air pollution emission permit pertaining to the air scrubbers. (Ex. 11). The initial approval allows emission of 0.83 lbs/hour or 1.5 tons/year of "chromic acid." The record does not disclose whether PEC obtained final approval for air emissions of chromic acid or other hazardous wastes.

The ducts have discharged and continue to discharge air as well as a mist of hexavalent chromium, lead, mercury, and arsenic. Christopher Erzinger, the CDPHE's Environmental Protection Specialist and lead inspector of the Facility beginning in 1992, testified that the mist contained hexavalent chromium in the form of a "suspended liq-

uid." This testimony is uncontroverted. This mist condensed, and continues to condense, on the soil adjacent to the air scrubbers. Such condensation is evidenced by stained soil extending approximately thirty feet from the Facility's main building towards the west. (Exs.18–19.) The CDPHE sampled this soil and determined that it contained 360 ppm (parts per million) of hexavalent chromium. The CDPHE's established toxicity level for hexavalent chromium in soil is 5 ppm.

Beginning in 1978, a yellow/orange liquid leaked from air scrubbers down the west side of the Facility's main building into the soil. (Ex. 6.) The CDPHE assayed this liquid in 1992 and determined that it contained 250,-000 ppm of hexavalent chromium, 50,000 times the concentration permissible in soil. Despite having knowledge of the leaking liquid since the late 1980's, and despite being informed by the CDPHE in 1992 that allowing such liquid to leak into the soil constituted illegal disposal, PEC did nothing to repair the leaks until August 1994. (Ex. 55.) Although the yellow/orange liquid no longer leaks down the west side of the Facility's main building into the soil, the soil remains contaminated.

### 3. *Storage*

At times after August 1, 1992, PEC stored at the Facility unlabeled drums containing chromium-contaminated byproducts, open drums containing chromium wastes, and drums without marked accumulation dates. PEC also failed to maintain adequate aisle space between its stored drums. (Stip.¶¶ 31–34.)

On August 3, 1992, several fifty-five gallon drums stored inside the east-central portion of the Facility's main building that contained hazardous waste had accumulated for over one year. (Exs.13–15.) Also on August 3, 1992, several fifty-five gallon drums stored outside the east side of the Facility's main building that contained hazardous waste from grinding operations had accumulated for at least three years. (Stip. ¶ 50; Ex. 17.)

On August 3, 1992, PEC stored approximately one hundred drums containing chrome-contaminated soil on the southwest exterior dock of the Facility's main building. (Stip. ¶ 52; Ex. 16.) Some, but not all, of the drums stored on the southwest exterior dock had been there for seven years by August 3, 1992. Also on August 3, 1992, approximately nine drums in the southwest external storage area containing hazardous waste were not labeled as containing hazardous waste, did not have lids, and did not have marked accumulation dates. (Stip.¶ 54.) As of August 3, 1992, PEC stored drums containing hazardous waste at the Facility for periods in excess of the ninety-day storage limitation for generator facilities set forth in 40 C.F.R. § 262.34. (Stip.¶ 57.) PEC does not currently have an EPA or State of Colorado permit or Interim Status for the storage of hazardous waste beyond the ninety-day limit. (Stip.¶ 56.) Nor has PEC ever sought or obtained an exemption from the ninety-day storage limitation period for generator facilities. (Stip.¶ 38.)

PEC is managing hazardous wastes currently generated by the Facility in compliance with applicable storage regulations. (Stip.¶ 65.) Waste currently generated is stored in properly labeled containers with adequate aisle space, transported to a permanent disposal facility, and stored at the Facility for less than ninety days. (Stip.¶ 65.) All drums of hazardous waste that were present and accumulating at the Facility for over ninety days were transported from the Facility for disposal at a permitted disposal facility by January 1994. (Stip.¶ 68.) The United States concedes that, based on the limited information available in its files and the site review conducted on April 2, 1998, PEC is complying with pre-transport accumulation time requirements. (Stip.¶ 65.)

### b. **Failure to Provide Notice of Activities**

On May 14, 1986, PEC notified the CDPHE that it was a generator of D002 (corrosive), D000 (toxic), F006 (waste water treatment sludge), U226 (111 trichloroethane), and U080 (methylene chloride) hazardous wastes. (Ex. 1 at 11). Although the notice references generic codes for corrosive and toxic wastes, PEC failed to notify the CDPHE that it generated hexavalent chromium. While the record indicates PEC subsequently notified the CDPHE on March 10,

1993 that it is a large quantity generator of hazardous waste, including those wastes identified as D007 (chromium), D008 (lead), and D009 (mercury) (Stip. ¶ 17; Ex. 1 at 15–16), PEC did not adequately disclose its generation, treatment, storage, and disposal of hazardous waste until cited for numerous violations of the RCRA and its implementing regulations.

The evidence shows that PEC failed to assess adequately its generation, treatment, storage, and disposal of hazardous waste. The evidence also shows that neither the CDPHE nor the EPA knew the severity and extent of PEC's noncompliance until the August 3, 1992 inspection. Defendants' failure to report accurately their activities impaired the ability of the CDPHE and the EPA to regulate effectively PEC's generation, treatment, storage, and disposal of hazardous wastes. As Walter Avramenko, the CDPHE's Hazardous Waste Cleanup and Permitting Unit Leader, testified, had PEC notified the CDPHE that it operated a treatment, storage, or disposal facility, the permitting requirements would have attached and, as part of those requirements, the CDPHE would have expected PEC to obtain a permit and provide closure plans, post-closure plans, and financial assurances.

### c. Contamination of Groundwater and Surface Water

As a result of this illegal disposal and storage of hazardous waste, groundwater at and under the Facility, as well as groundwater under areas outside the Facility, is contaminated with levels of hexavalent chromium that greatly exceed established toxicity standards. (Stip.¶¶ 39–40.) Two geologists, both qualified as experts in the field of groundwater hydrology, testified regarding groundwater contamination.

Both Michael Wireman ("Wireman"), expert for the United States, and Michael Galloway ("Galloway"), expert for defendants, testified that a plume of chrome contamination originates at the southwest corner of the Facility and extends approximately 3,310 feet in a north-northwesterly direction to the South Platte River. (Exs.26, 27.) The contaminated groundwater forms part of the South Platte Valley Fill Aquifer, which is a quickly moving aquifer with a steep gradient when compared to other aquifers in the region. The aquifer and the South Platte River are hydrologically connected. The bedrock gradient directs the aquifer towards the South Platte River. Preferential flow paths created by storm drainage pipes and other water conduits probably accelerate the time of contaminant transport to the South Platte River. Wireman believes the time of contaminant transport from the Facility to the South Platte River at eight to ten years. I find Wireman's opinion credible.

The CDPHE's established toxicity level for hexavalent chromium in groundwater is 100 Sg/L (micrograms per liter). The EPA tests detected 77,600 μg/L of hexavalent chromium at the heart of the contaminant plume in 1997, one of the highest concentrations in recent years. At the VFW outfall, a storm pipe that drains into the South Platte River where the plume intersects with the river, EPA groundwater tests detected 3,200 μg/L of hexavalent chromium. At the Harvard Gulch outfall, a water conduit that runs through the plume but intersects the South Platte River south of the plume's intersection with the river, EPA tests detect 280 μg/L of hexavalent chromium. (Exs.26, 27.)

The facility began operations in the late 1970's. Most of the plating tanks were installed in 1977. (Ex. Y, App.3.) Hexavalent chromium from the Facility first reached the South Platte river in approximately 1986, as indicated by water samples taken by the Denver Department of Health. The CDPHE's established toxicity level for hexavalent chromium in South Platte river surface water is 16 μg/L for chronic conditions and 11 μg/L for acute conditions. In 1985, water samples detected 1 μg/L of hexavalent chromium in the South Platte River near the Facility. Samples taken in 1987 and 1988 detected approximately 100 μg/L of hexavalent chromium at the same site, leading to the conclusion that hexavalent chromium disposed by PEC in 1977 reached the South Platte River in 1986 or 1987. This evidence further supports Wireman's eight to ten year transport rate opinion. In November 1989, samples detected more than 100 μg/L of hexavalent chromium at the same site. Both experts testified that the following are

sources or probable sources of the hexavalent chromium plume: the three open waste piles of soil excavated from beneath the plating tanks, the soil remaining beneath the plating tanks, and the soil contaminated by the air scrubbers. These sources will continue to create a contaminant plume until remediated.

### d. Issuance of Compliance and Administrative Penalty Orders

The CDPHE inspected the Facility on May 11–12, 1993 and January 27, 1994, again observing and reporting violations of federal and state regulations regarding storage and disposal of hazardous waste. The CDPHE issued an Initial Compliance Order on July 28, 1994. Defendants requested an informal conference with CDPHE, staying the Initial Compliance Order. The CDPHE and defendants held informal conferences between September 1994 and June 1996.

The CDPHE then issued a Final Administrative Compliance Order on June 13, 1996. Defendants did not appeal the Final Compliance Order, which requires, inter alia: (1) immediate compliance with applicable hazardous waste laws and regulations; (2) refraining from the treatment, storage, and disposal of hazardous waste without obtaining either Interim Status or a Part B permit; (3) proper management of existing hazardous waste; (4) submission, for review and approval, of a plan for conducting weekly inspections of containers that contain hazardous waste; (5) submission of a complete 1990/1991 Biennial Report that reflects all hazardous waste generated, treated, stored, and disposed of during years covered by such report; (6) submission of an updated 1992 / 1993 Biennial Report that reflects all hazardous waste codes applicable to PEC's off-site disposal; (7) implementation of the "Removal Plan for Chrome Contaminated Stockpiled Soils" that the CDPHE conditionally approved on July 20, 1995; (8) submission for review and approval of a soil characterization work plan and groundwater sampling work plan; (9) submission for review and approval of a corrective measure study plan that evaluates the alternatives of remedial action to prevent, mitigate, and remediate the release of hazardous waste from the Facility; and (10) within thirty days of the CDPHE's approval of the corrective measure study plan,

implementation of the selected remedial alternative. (Ex. 21 at 20–26.)

Defendants have complied with certain requirements of the Final Compliance Order. PEC submitted several requested plans to the CDPHE regarding emergency preparedness, personnel training, soil characterization, and groundwater sampling. (Exs.S–Z, A1.) The CDPHE rejected as deficient the first draft of some of these plans. Some of the plans have now been approved. At least one plan has not been reviewed by the CDPHE. In accordance with the Final Compliance Order, PEC also ceased treating waste in September 1992.

Defendants, however, have failed to implement the "Removal Plan for Chrome Contaminated Stockpiled Soils," conditionally approved by the CDPHE on July 20, 1995, regarding the three open waste piles of contaminated soil. The Final Compliance Order required defendants to excavate, containerize, and transport this contaminated soil to a permitted disposal facility for disposal within fifteen days of the order's issuance. After the issuance of the Final Compliance Order, defendants proposed bioremediation instead of excavation, containerization, and disposal. The CDPHE rejected this proposal and continues to require excavation, containerization, and disposal of these contaminated soils stored in three separate waste piles.

On December 23, 1996, the CDPHE issued an Administrative Penalty Order assessing civil monetary penalties. Both the United States and defendants calculate the current penalty amount at approximately $1,875,000. Defendants did not appeal the Administrative Penalty Order and have not paid any portion of the assessed civil monetary penalties.

### e. Estimated Costs of Remediation

As stated, federal and state regulations require hazardous waste facilities that treat, store, and dispose of hazardous waste to obtain a permit. When a facility obtains a permit, the facility must submit remediation, closure, and post-closure plans, together with evidence of financial assurances that guarantee the availability of funds for remediation, closure, and post-closure care. The amount of financial assurances is based, in large part,

on the remediation, closure, and post-closure plans.

Here, defendants illegally treated, stored, and disposed of hazardous waste without a permit or Interim Status. Because defendants did not seek a permit or Interim Status, they have evaded the normal approval process and the requirements for submission of a written remediation, closure, and post-closure plan. Significantly, defendants' omission evaded the critical requirement that they provide financial assurances. Indeed, PEC has only recently implemented soil and groundwater characterization plans. PEC submitted a final site investigation report on May 11, 1998, the first day this hearing.

Neither the CDPHE, the EPA, or the defendants' experts have a complete understanding of the extent of contamination. Without that, the costs of remediation are difficult to estimate. Yet, even when a treatment, storage, or disposal facility formulates closure and post-closure plans early on pursuant to the permit process, the amount of financial assurances is based on conservative estimation of closure costs. Under these circumstances, I find that the absence of a closure plan and post-closure plan is not fatal to the United States' request for financial assurances. Given the experts' knowledge of the sources of contamination, the severity of the contaminant plume, and the known costs of certain remediation devices, I conclude that they are able to give reliable estimates of remediation costs.

Based on current estimates of contamination, the CDPHE estimates the cost to remediate the contaminated soil and groundwater at between $3,000,000 and $6,000,000. This estimate also includes costs of subsequent monitoring of groundwater and soil.

In 1997, PEC's counsel represented to counsel for the United States that remediation will cost $2,300,000. Further, Daniel Frieson ("Frieson"), PEC's controller, testified that he knew of estimates ranging from $2,500,000 to $5,000,000. The record, however, contains no explanation for the estimates of PEC's counsel and Frieson.

Galloway, defendants' hydrologist, testified that remediation of the groundwater could be achieved by installation of passive treatment walls. Passive treatment walls, utilized at other hexavalent chromium contamination sites, permit groundwater to flow through the wall. A chemical filtration reaction occurs as the groundwater flows through the wall. Galloway testified logically that proper remediation of the plume will require installation of passive treatment walls at two locations: (1) near the Facility; and (2) immediately before the plume's intersection with the South Platte river. Galloway estimates that installation of these passive treatment walls and subsequent monitoring will cost $1,200,000 for ten years. Galloway's estimate does not include remediation costs for contaminated soil.

Based on the direct and circumstantial evidence, I find that remediation of the soil and groundwater will cost approximately $3,500,000. Galloway's calculation of $1,200,000 is a credible estimate, but only includes groundwater remediation for a period of ten years. The CDPHE's estimate of $3,000,000 to $6,000,000 is not substantially different than PEC's estimates of $2,300,000 to $5,000,000. Accordingly, the United States' request for financial assurances in the amount of $3,500,000 is a fair estimate of the costs of remediation.

#### f. Ability of Defendants to Provide Financial Assurances

The United States requested that defendants provide financial assurances for the Facility by October 31, 1997. Defendants represented that they do not have sufficient assets to provide financial assurances. The evidence shows, however, that defendants, collectively, have the financial ability to provide financial assurances in the amount of $3,500,000. Lilienthal stipulates that, as an "owner" and "operator" of the Facility as those terms are defined by 6 COLO. CODE REGS. 1007–3 § 261.10, he is subject to any mandatory injunctive order directing defendants to secure financial assurances. (Stip. ¶ 72.)

PEC is a viable, profitable company with a low debt-equity ratio and positive cash flow. In recent years, it has earned a return of 14% of its net worth. Beginning in 1992 and 1993, and coinciding with the CDPHE compliance investigation, PEC began to reduce

its debt. PEC satisfied several obligations, including bank loans, lines of credit, and private loans owed to the Lilienthal Family Trust. PEC reduced its debt by $775,495 between November 30, 1991 and November 30, 1997. PEC prepaid many of these obligations. While reduction of debt is a prudent business practice under many circumstances, the evidence indicates that PEC's prepayment of loans significantly reduced its readily available cash. Prepayment also insulated Lilienthal from personal liability for such loans as a personal guarantor on all of the obligations. At Lilienthal's behest, PEC and Redoubt increased his salary and bonus to approximately $315,000 in 1997, a 200% increase since 1992. Lilienthal's salary increase further reduced the amount of cash available to PEC and Redoubt for remediation.

Despite this pattern of debt reduction, I find that PEC and Redoubt can contribute substantially to defendants' collective ability to provide financial assurances. PEC has a net book value of $2,000,000. Although the land may be worth little or nothing because of the contamination, it would be worth between $3,000,000 and $5,000,000 once remediated. Further, Melinda Harper ("Harper"), an expert in accountancy whose testimony I find credible on this issue, testified that PEC and Redoubt have the ability to accumulate readily available cash in the amount of $800,000 over the next eight to ten months. Melinda Harper's estimate considers near term expenditures and does not appear to jeopardize PEC's earning capacity or ability to pay operating costs. This $800,000 figure derives from the following sources: (1) currently available cash; (2) sale of UNUM stock worth approximately $500,000, in which PEC has zero tax basis; (3) decreasing Lilienthal's 1998 estimated salary and bonus by approximately 50%; and (3) securing a loan on officers' life insurance policies to obtain $48,000.

Lilienthal also has the ability to contribute substantially. Despite his testimony otherwise, the evidence shows that he is a sophisticated businessman. The transactions he engaged in over the last several years reflect a high degree of business acumen and awareness of pertinent issues. In general, I find Lilienthal's testimony lacking in credibility. Although Lilienthal testified that he has few assets and substantial liabilities, the evidence shows that Lilienthal has the ability to contribute assets worth approximately $1,400,000 towards financial assurances.

Lilienthal owns one-half interest in a Vail, Colorado duplex worth approximately $2,400,000. The co-owner of this property is Lilienthal's brother, Jack Lilienthal. In January 1996, Lilienthal attempted to transfer his one-half interest in the Vail duplex to his wife, Kathleen Linneman ("Linneman"), without consideration. Lilienthal, however, is precluded by agreement with Jack Lilienthal from transferring his interest in the duplex to his wife until his transfer is likely void or voidable. Although Lilienthal delivered the quit claim deed to Linneman, he instructed Linneman not to record the deed until his death and she has not recorded the deed.

Lilienthal also owns one-half interest in a house in Belize worth approximately $230,000 and one-half interest in a house in Page, Arizona worth approximately $200,000. The house in Belize is unencumbered and the house in Page carries a $100,000 mortgage. Lilienthal's equity in the Belize and Page properties is $165,000.

The evidence also reflects that Lilienthal has full use and enjoyment of three additional assets:

(1) In January 1996, Lilienthal transferred to Linneman his one-half interest in their Denver residence without consideration. This residence is worth approximately $300,000 and serves as the couple's primary residence. Approximately five months after the purported transfer, Linneman obtained a $600,000 loan and pledged their Denver residence as collateral. The record does not disclose the purpose or application of the loan proceeds.

(2) Also in January 1996, with Lilienthal's assistance, Linneman acquired a house in Paradise Valley, Arizona at a cost of $1,325,000. Lilienthal conceded that he and Linneman occasionally stay at the Paradise Valley house.

(3) Lilienthal has a future property interest in the Lilienthal Family Trust, a

generation-skipping trust created by Lilienthal's deceased father. Upon his mother's death, Lilienthal and his brother are the co-beneficiaries of the trust. The record does not disclose the value of the trust.

Despite his divestiture or attempted divestiture in 1996 of the Vail duplex, the Denver residence, and the Paradise Valley house, Lilienthal continues to pay the mortgage payments, insurance payments, utility payments, and general maintenance costs for each property. Lilienthal testified that he divested or attempted to divest himself of the Vail duplex and the Denver residence in 1996 to preclude his daughter from inheriting these properties upon his death. Even assuming the truth of his professed motive, the affect of these transfers insulated his assets from creditors and decreased assets available for remediation.

The evidence thus shows that Lilienthal has current ownership and direct access to the Vail duplex and the houses in Belize and Page. The combined value is $1,365,000. Lilienthal can easily contribute another $35,000 from his PEC and Redoubt salaries or a private lender. Accordingly, I find that Lilienthal has the financial wherewithal to provide financial assurances in the amount of $1,400,000.

Based on the timing of these significant patterns of debt reduction and asset divestiture, I further find that defendants have deliberately attempted to evade or minimize the payment of environmental remediation, civil monetary penalties, and financial assurances. A significant burden exists, however, in combination, to provide financial assurances and pay civil monetary penalties in the amount of $1,875,000 within the near term. By seeking an order requiring defendants to provide financial assurances in the amount of $3,500,000, the United States has prioritized financial assurances over the payment of civil monetary penalties. Given the demonstrated profitability of PEC, however, I see no reason why defendants cannot achieve remediation over a reasonable period of time, even after providing financial assurances.

I also find that defendants can obtain financial assurances at a reasonable market price. The testimony of both Harper and defendants' accounting expert, John Mahan ("Mahan"), indicates that defendants, collectively, could provide a trust fund, letter of credit, surety bond, insurance policy, or combination thereof, in the amount of $3,500,000. Both Harper and Mahan contacted insurers to ascertain the requirements for each mechanism.

During direct examination, Mahan testified about the complexity, cost, and inability of defendants to obtain financial assurances for the full remediation and closure costs of the Facility. To establish a trust fund, defendants would have to provide or borrow assets equal to the amount of the trust fund. To obtain a letter of credit, surety bond, or insurance policy, defendants would have to provide security having a value equal to or nearly equal to the amount of the letter of credit, surety bond, or policy limit of the insurance policy. Because the exact costs of remediation and closure are unknown, Mahan testified that any potential lender would conservatively estimate the costs of remediation and closure, increasing the cost to defendants.

Mahan was not informed, however, that the United States seeks financial assurances in the fixed amount of $3,500,000. Once aware of this fact, Mahan conceded during cross-examination that defendants could provide financial assurances through a combination of acceptable mechanisms. Specifically, Mahan testified that available assets could be placed in a trust fund and the remaining amount could be provided by an insurance policy or bond. Mahan also testified that, if defendants are unable to pay the entire premium of an insurance policy or bond, defendants could borrow all or part of the premium costs from a private lender. The reduction of Lilienthal's salary and bonus by 50% could, alone, provide PEC with enough available future cash to finance the yearly interest cost of an insurance premium. Mahan's testimony comports with Harper's testimony that PEC is an insurable entity, given its profitability and assuming Lilienthal stands behind the company as a guarantor.

Accordingly, I find that defendants are capable of providing financial assurances.

PEC's readily available cash of $800,000, when combined with Lilienthal's directly owned assets of $1,400,000, could be placed in a trust fund with a present value of $2,200,-000. Defendants could borrow the remaining $1,300,000, obtaining an insurance policy for that fixed amount.

Lastly, the United States alleges that defendants' counsel threatened on three occasions that Lilienthal would abandon the Facility and move to Belize if the CDPHE continued to pressure defendants. I find that these threats were "posturing" by defense counsel and I am unable to conclude that Lilienthal intends to flee the United States in favor of a foreign county. I find, however, that defendants overtly threatened to file bankruptcy and liquidate all assets if the federal and state governments continue to seek the Facility's compliance with federal and state hazardous waste regulations.

## IV. CONCLUSIONS OF LAW

Defendants submit two legal arguments that require resolution before analysis of the equities. First, defendants argue that the Facility is currently operating in compliance with Colorado's regulations and, therefore, is exempt from financial assurance requirements. Second, defendants contend that the United States may not attempt to obtain financial assurances for past violations of Colorado regulations. I address each argument separately.

### a. Current Noncompliance

■ Defendants first contend that the Facility is operating in compliance with Colorado's regulations, exempting the Facility from financial assurance requirements. I disagree. The evidence shows that the defendants currently dispose of hazardous waste without a permit or interim status and without providing financial assurances. The Facility is disposing hazardous waste in three distinct ways: (1) the Facility's air scrubbers dispose a mist of hexavalent chromium condensate onto Facility soil; (2) the Facility failed to remediate the soil contaminated by a yellow/orange liquid that leaked from air scrubbers down the west side of the Facility's main building; and (3) the Facility failed to remediate the three open waste piles of contaminated soil excavated from beneath the chrome-plating tanks and the remaining contaminated soil located beneath the chrome-plating tanks. I discuss separately the legal justification for these conclusions of law.

1. *Deposit of Hexavalent Chromium Condensate Mist onto the Soil*

■ The Facility's air scrubbers currently dispose a mist of hexavalent chromium condensate mist onto Facility soil. This disposal is a continuing violation that has occurred since the installation of the air scrubbers in the late 1970's. The soil contaminated by this disposal has not been remediated and is a likely source of groundwater contamination.

RCRA establishes a regulatory structure for the treatment, storage, and disposal of solid and hazardous wastes. Solid wastes are regulated pursuant to Subchapter IV, 42 U.S.C. §§ 6941–6949a. Hazardous wastes are subject to the more stringent standards of Subchapter III, § 42 U.S.C. § 6921–6939b. Under RCRA, "hazardous wastes" are a subset of "solid wastes." *See* 42 U.S.C. § 6903(5). Accordingly, for a waste to be classified as hazardous, it must first qualify as a "solid waste." *See United States v. Self,* 2 F.3d 1071, 1076 (10th Cir.1993) (citations omitted); *see also United Technologies Corp. v. U.S. EPA,* 821 F.2d 714, 716 n. 1 (D.C.Cir. 1987).

RCRA defines "hazardous waste," in relevant part, as:

.. a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness ... or pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(5); *see also* C.R.S. § 25–15–101(6) (identical definition). There is no dispute that hexavalent chromium is "hazardous" as defined by Colorado regulations. *See* 6 COLO. CODE REGS. 1007–3 § 261. The hexavalent chromium condensate, however, must

also qualify as a "solid waste" to come within the regulatory sphere of RCRA.

RCRA defines "solid waste" to include "any ... discarded material, including ... liquid ... material resulting from industrial ... activities ...." 42 U.S.C. § 6903(27). Erzinger described the hexavalent chromium condensate expelled by the air scrubbers as a mist of "suspended liquid." This testimony is uncontroverted. Thus, the chromium condensate expelled by the air scrubbers is a liquid material resulting from industrial activity.

Colorado regulations narrow the definition of "solid waste" to "any discarded material that is not excluded by § 261.4(a) or that is not excluded by a variance granted under § 260.30 and § 260.31." 6 COLO. CODE REGS. 1007–3 § 261. Defendants do not contend that hexavalent chromium condensate is subject to the § 261.4(a) exclusion or that the condensate has been granted a variance under §§ 260.30 and 260.31. Thus, whether hexavalent chromium condensate is a solid waste turns on whether it is a "discarded material." *Self,* 2 F.3d at 1076.

The regulations define "discarded material" as material that is "[a]bandoned," "[r]ecycled," or "[c]onsidered inherently wastelike." 6 COLO. CODE REGS. 1007–3 § 261.2(a)(2). There is no evidence indicating that the Facility recycled the hexavalent chromium condensate or that the condensate satisfies the "inherently wastelike" criteria. Thus, the condensate must be "abandoned" to constitute solid waste. A material is "abandoned," inter alia, by being burned, incinerated, or "[d]isposed of." *Id.* at § 261.2(b)(2). As noted by the Tenth Circuit, "[t]he determination of whether a material is a solid waste by virtue of being disposed of leads us in circles in that the statutory and regulatory definitions of "disposal" depend in part on whether the material is a solid waste." *Self,* 2 F.3d at 1077 n. 3 (citing 42 U.S.C. § 6903(3); 40 C.F.R. § 260.10; *Reading Co. v. City of Philadelphia,* 823 F.Supp. 1218, 1235–1237 (E.D.Pa.1993); *Zands v. Nelson,* 779 F.Supp. 1254, 1261–1262 (S.D.Cal.1991)). Despite this circuitous path, I must follow the plain and ordinary meaning of the regulations.

"Disposal" is defined as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3); C.R.S. § 25–15–101(3); 6 COLO. CODE REGS. 1007–3 § 261.10. Here, the evidence demonstrates that the Facility's scrubbers currently deposit, and have deposited for several years, a mist or "suspended liquid" of hexavalent chromium condensate onto Facility land. Soil contamination extends approximately thirty feet west from the scrubbers. (Exs.18, 19.)

Defendants contend that, because the air scrubbers discharge the condensate into the air, the discharge does not constitute placement of solid waste "into or on any land or water." The evidence shows, however, that the air scrubbers discharge condensate only a few feet above the ground, and potentially only inches from the ground. (Exs.6, 7.) Acceptance of defendants' overly narrow interpretation of the definition would exclude recognized acts of disposal, such as the dumping of waste by a dump-truck and the discharge of liquid waste by an effluent pipe situated several inches or feet above land, merely because the hazardous waste becomes airborne briefly before contacting the land. Though the definition of "disposal" is not limitless, its has broad scope. I hold that the discharge of hexavalent chromium condensate from the air scrubbers, which settles onto the Facility soil, satisfies the broad definition of "disposal ." Accordingly, I find and conclude that the Facility is now disposing hexavalent chromium condensate. Because the Facility "disposes" the condensate, it constitutes "discarded material" and, therefore, "solid waste" as defined by Colorado regulations.

2. *Continuing ·Disposal of Hexavalent Chromium by Defendants' Failure to Remediate the Soil Contaminated by Liquid that Leaked Down the Outside Western Wall from the Air Scrubbers*

■ Defendants have not remediated the soil contaminated by the yellow/orange liquid that leaked from air scrubbers down the west side of the Facility's main building. Al-

though PEC apparently repaired these leaks in 1994, liquid containing approximately 250,-000 ppm of hexavalent chromium leaked into the soil for nearly two decades.

Defendants concede that the leaking of this liquid into the soil constituted "disposal" as that term is defined. Defendants argue, however, that because the leaks were repaired in 1994 and liquid no longer leaks down the wall into the soil, this disposal ceased. Indeed, unlike the ongoing discharge of hexavalent chromium condensate mist from the air scrubbers that continues to add hazardous waste to the soil, the leaks no longer add hazardous waste to the soil at the base of the west wall. Yet this soil remains in an unremediated state and is a probable source of groundwater contamination.

Courts have grappled with the issue whether the continued presence of an illegally disposed hazardous waste constitutes a continuing violation under the RCRA. The overwhelming majority have found continuing violations for substantive violations of the RCRA when the environmental harms caused by the violations are curable, even when the affirmative act that initiates the violation occurred on a single day. *See, e.g., In re Consolidated Land Disposal Regulation Litigation*, 938 F.2d 1386, 1388–1389 (D.C.Cir.1991) ("disposal" is equated with "leaking," a "continuous phenomenon rather than a discrete event"); *Aurora Nat'l Bank v. Tri Star Marketing, Inc.*, 990 F.Supp. 1020, 1025 (N.D.Ill.1998); *City of Toledo v. Beazer Materials & Services, Inc.*, 833 F.Supp. 646, 656 (N.D.Ohio 1993) (disposal of wastes in violation of the RCRA can constitute a continuing violation for purposes of citizen suit as long as the waste has not been remediated and the environmental effects remain remediable); *Gache v. Town of Harrison, New York*, 813 F.Supp. 1037, 1041 (S.D.N.Y.1993) ("The environmental harms do not stem from the act of dumping when waste materials slide off the dump truck but rather after they land and begin to seep into the ground, contaminating the soil and water."); *Acme Printing Ink Co. v. Menard, Inc.*, 812 F.Supp. 1498, 1512 (E.D.Wis.1992) ("RCRA includes in its broad definition of 'disposal' the continuous leaking of hazardous substances .... Accordingly, leaking of hazardous substances may constitute a continu-

ous or intermittent violation of RCRA."); *Fallowfield Development Corp. v. Strunk*, 1990 WL 52745 (E.D.Pa.1990) (violation continues until proper disposal procedures are put into effect or the hazardous waste is remediated); *North Carolina Wildlife Federation v. Woodbury*, 29 E.R.C.1941, 1989 WL 106517 (E.D.N.C.1989) (same); *United States v. Conservation Chemical Co.*, 619 F.Supp. 162, 200 (W.D.Mo.1985) (RCRA could be applied to enjoin present leaking resulting from past disposal of hazardous waste in imminent hazard action), *overruled on other grounds*, *United States v. Northeastern Pharmaceutical & Chemical Co., Inc.*, 810 F.2d 726, 741 (8th Cir.1986); *United States v. Ottati & Goss, Inc.*, 630 F.Supp. 1361, 1400 (D.N.H. 1985) (same); *Jones v. Inmont Corp.*, 584 F.Supp. 1425, 1435 (S.D.Ohio 1984) (same). *See also Acme Printing Ink Co. v. Menard, Inc.*, 891 F.Supp. 1289, 1301–1302 (E.D.Wis. 1995) (collecting cases); Albert C. Lin, *Application of the Continuing Violations Doctrine to Environmental Law*, 23 ECOLOGY L.Q. 723, 737–741 (1994) (collecting and categorizing cases). *But see Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co., Inc.*, 989 F.2d 1305, 1315 (2d Cir.1993) (lead shot and clay target debris previously deposited into Long Island Sound by trap and skeet shoot club, although decomposing and contaminating wildlife, did not constitute "present violation" of RCRA for purposes of citizen's suit under 42 U.S.C. § 6972(a)).

Because the definition of "disposal" includes the word "leaking," disposal occurs not only when a solid waste or a hazardous waste is first deposited onto ground or into water, but also when such wastes migrate from their initial disposal location. The soil contaminated by the yellow/orange liquid that leaked from air scrubbers down the west side of the Facility's main building remains. Tests conducted by Erzinger indicate that hexavalent chromium remains at the junction of the western wall and the land. Based on the testimony of Wireman and Galloway, one can reasonably infer that hexavalent chromium leaches into the groundwater from this source. Further, both Wireman and Galloway testified that these conditions are remediable. Accordingly, I conclude that the leaching of hazardous waste into the ground-

water from this soil constitutes continuing disposal of hazardous waste.

### 3. Failure to Remediate the Three Open Waste Piles of Contaminated Soil Excavated from Beneath the Chrome Plating Tanks and the Soil Remaining Beneath the Plating Tanks

The same analysis applies to the three open waste piles of contaminated soil excavated from beneath the chrome-plating tanks and the contaminated soil located beneath the chrome-plating tanks. Although PEC installed additional containment systems to prevent discharges of hazardous waste into the soil beneath the plating tanks, hexavalent chromium likely remains beneath the plating tanks. This hexavalent chromium is a probable source of groundwater contamination. In this unremediated state, the contaminated soil constitutes disposal of hazardous waste.

■ The United States also contends that defendants' retention of the three open waste piles composed of contaminated soil excavated from beneath the plating tanks constitutes illegal "storage" of hazardous waste. Indeed, this waste is not stored in containers or properly labeled. (Ex. 7 (open waste pile covered with tarp and cinder blocks); Exs. 8–9 (open waste pile); Ex. 10 (open waste pile).) Further, this waste has accumulated for several years. While I hold, for the purposes of this motion, that this disposal of hazardous waste now occurs at the Facility, I cannot conclude that defendants currently store hazardous waste in violation of Colorado regulations.

"Storage" is defined as "the *containment* of hazardous waste, either on a temporary basis for a period of years, *in such a manner as not to constitute disposal of such hazardous waste.*" 42 U.S.C. § 6903(33) (emphasis added); 6 COLO. CODE REGS. 1007–3 § 261.10 (identical definition). Defendants dumped the contaminated soil onto the land "so that such ... hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters" and, hence, they engaged in "disposal." Because the dumping constitutes ongoing illegal disposal, and because the United States has stipulated that defendants' creation of the uncontained waste piles constituted "disposal" (Stip.¶ 71),

I conclude that no evidence exists of current illegal storage.

### 4. Conclusion Regarding Current Noncompliance

Colorado regulations define a "treatment, storage, or disposal site or facility" ("TSDF") as "a location at which hazardous waste is subjected to ... disposal and may include a facility where hazardous waste is generated." 6 COLO. CODE REGS. 1007–3 § 261.10. Because defendants currently dispose of hazardous waste at the Facility, they own and operate a TSDF. A generator of hazardous waste that treats, stores, or disposes of hazardous waste on-site must comply with § 262 (standards applicable to generators of hazardous waste), § 264 (standards for owners and operators of hazardous waste treatment, storage, and disposal facilities), § 265 (interim status standards for owners and operators of hazardous waste treatment, storage, and disposal facilities), and, critically, § 266 (Colorado financial assurance requirements). *See* 6 COLO. CODE REGS. 1007–3 § 262.10 n. 2.

There is no dispute that PEC is the "operator" of the Facility within the meaning of 6 COLO. CODE REGS. 1007–3 § 261.10. PEC is and was a "generator" of hazardous waste as defined by 6 COLO. CODE REGS. 1007–3 § 261.10 and 40 C.F.R. § 260.10. (Stip.¶¶ 15–16.) Redoubt is an "owner" of the Facility as that term is defined by 6 COLO. CODE REGS. 1007–3 § 261.10. (Stip.¶ 14.) Lilienthal stipulates that, as an "owner" and "operator" of the Facility as those terms are defined by 6 COLO. CODE REGS. 1007–3 § 261.10, he is subject to any mandatory injunctive order directing defendants to secure financial assurances. (Stip.¶ 72.) Because defendants currently own and operate a TSDF, Colorado regulations require them to provide financial assurances. Indeed, Colorado regulations require defendants to do much more than provide financial assurances, but these additional requirements are outside the scope of relief requested by the United States in this motion for preliminary injunction.

### b. Application of RCRA's Financial Assurance Requirements to Past Conduct

■ Defendants next argue that the United States may not obtain financial assurances

for past violations of RCRA. (Defs.' Resp. to Plf.'s Mot. Prelim. Injunction at 12.) The premise for this argument is that the financial assurance requirements apply only prospectively and that the United States may not require financial assurances for past acts of disposal, even if such acts of disposal occurred after RCRA became effective. As discussed above, I conclude that defendants are operating a hazardous waste facility by virtue of three distinct types of current disposal, subjecting them to the financial assurance requirements. Even assuming defendants do not currently dispose of waste, I hold that the United States may require defendants to provide financial assurances for defendants' admitted prior acts of treatment, storage, and disposal of hazardous waste.

Initially, I note that defendants' argument does not invoke the issue of retroactivity. The admitted prior treatment, storage, and disposal of hazardous waste occurred after the effective dates of RCRA and its implementing regulations. The United States does not seek to impose liability for acts committed before RCRA's effective date. Defendants cannot and do not argue that they were given inadequate notice of prohibited conduct. Thus, I need not address retroactivity. *See, generally, Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); *United States v. Rohm and Haas Co.,* 2 F.3d 1265, 1269 (3d Cir.1993) (RCRA's permitting program is "prospective . . . [and] applies only to active . . . facilities and to . . . facilities closed after November 19, 1980"); *Interfaith Community Organization v. AlliedSignal, Inc.,* 928 F.Supp. 1339, 1349–1351 (D.N.J.1996) (RCRA permit requirements do not apply to activities predating effective date of RCRA); 53 Fed.Reg. 31,149 (August 17, 1988) ("only facilities where hazardous waste is intentionally placed into land or water after November 19, 1980 require RCRA disposal permits").

RCRA gives the EPA and, pursuant to 42 U.S.C. § 6926(b), the State of Colorado, broad authority to regulate the disposal of hazardous waste. RCRA directs the establishment of "performance standards, applicable to owners and operators of facilities for the treatment, storage, or disposal of hazard-

ous waste . . . ." 42 U.S.C. § 6924(a). In establishing such standards, the EPA or State of Colorado:

> . . shall, where appropriate, distinguish in such standards between requirements appropriate for new facilities and for facilities in existence on the date of promulgation of such regulations. Such standards shall include, but need not be limited to, requirements respecting—. . . the maintenance of operation of such facilities and requiring such additional qualifications as to ownership, continuity of operation, training for personnel, and financial responsibility (including financial responsibility for corrective action) as may be necessary or desirable; . . . .

42 U.S.C. § 6924(a)(6). Thus, RCRA gives the EPA and State of Colorado broad authority to establish financial responsibility standards and does not preclude, expressly or impliedly, the requirement of financial assurances for past conduct. A review of both federal and state regulations reflects that defendants are required to provide financial assurances for their past operation of a TSDF.

The federal regulations clearly require defendants to provide financial assurances. The financial responsibility requirements apply "to those owners and operators of facilities in existence on November 19, 1980 who have failed to provide timely notification as required by [42 U.S.C. § 6930(a) ] *and/or* failed to file Part A of the permit application as required by 40 C.F.R. § 270.10(e) and (g)." 40 C.F.R. § 265.1(b) (emphasis added); *accord* 6 COLO. CODE REGS. 1007–3 § 265.1(b); *see also* 40 C.F.R. § 265.140. Section 265.1(b) requires "non-filers" or "non-notifiers" to comply with the financial responsibility requirements. It is undisputed that defendants, owners and operators of an existing hazardous waste facility in 1980, did not file a Part A permit application as required by 40 C.F.R. § 270.10(e) and (g). (Stip.¶ 42.) Nor did defendants file a Part B application. (Stip.¶ 42.) Thus, defendants were required to provide financial assurances in accordance with 40 C.F.R. § 265.1(b) unless otherwise exempted. Defendants fail to argue that they were otherwise exempted by statute or

regulation from providing financial assurances.

Colorado regulations impose liability for financial assurances upon "owners and operators of all hazardous waste facilities, . . . ." 6 COLO. CODE REGS. 1007–3 § 266.10(a); *see also* 6 COLO. CODE REGS. 1007–3 § 266.14 ("an owner or operator . . . must establish financial assurance for closure, and if applicable, post-closure of the facility"). Interpreted literally, this language does not restrict the applicability of the financial assurance requirements to past conduct. As a matter of law, the conduct must have occurred after RCRA and its relevant implementing regulations became effective. *Rohm and Haas,* 2 F.3d at 1269. The time of the conduct, however, is not otherwise restricted by the literal language of Colorado's regulations.

Nothing within RCRA's "cradle-to-grave" regulatory scheme indicates that owners and operators of hazardous waste facilities are exempt from providing financial assurance requirements before remediation and closure is accomplished. To the contrary, the clear intent of federal and state regulations is for the financial assurance requirements to attach until remediation, closure, and, if necessary, post-closure care is assured. *See* 40 C.F.R. § 265.1(a) (standards for Interim Status facilities "define the acceptable management of hazardous waste *during the period of interim status and until certification of final closure* " (emphasis added)); *see also* 40 C.F.R. 265.1(b) (Interim Status standards "apply . . . until either a permit is issued . . . or until applicable . . . closure and post-closure responsibilities are fulfilled"); 6 COLO. CODE REGS. 1007–3 §§ 265.1(a) and (b).

Defendants' failure to disclose their treatment, storage, and disposal of hazardous waste does not now exempt them from the financial assurance requirements. The evidence shows that defendants were legally obligated to but did not file a permit application, seek interim status, or cease their activities of treatment, storage, and disposal. Like many of the facilities operating before and after RCRA's effective date, the Facility is now somewhere between the cradle and grave. The recent discovery of defendants' previous unauthorized activities does not, at this juncture, relieve them from their legal obligation to provide financial assurances.

To hold otherwise would be contrary to the expressed intent of Congress, the clear language of applicable regulations, and public policy. To reward defendants' past evasion of RCRA would encourage similar conduct by others.

■ Lastly, defendants contend that the financial assurance requirements are part of the integrated permit scheme and, therefore, a facility is not required to provide financial assurances unless it is also required to have a permit. Defendants stress that neither the CDPHE nor the EPA has requested that defendants obtain a permit for the operation of a TSDF. This argument, however, fails. While the defendants accurately note that a facility must provide financial assurances before a permit will issue, the financial assurance requirements attach regardless of whether a facility actually applies for a permit. 6 COLO. CODE REGS. 1007–3 §§ 266.10, 266.14. Indeed, the financial assurance requirements apply to unpermitted facilities. *Id.*

In summary, I conclude that defendants currently operate a TSDF without a permit or interim status and without providing financial assurances. I also conclude that, even if defendants did not currently operate a TSDF, they are required to provide financial assurances for past acts of treatment, storage, and disposal that occurred after RCRA became effective. Thus, I next analyze the equities regarding the issuance of a mandatory injunction requiring defendants to provide financial assurances in the amount of $3,500,000.

### c. Analysis of Equities

#### 1. *Irreparable Harm to Public Health or Environment*

■ As the Supreme Court has warned, "environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Production Co. v. Village of Gambell, Arkansas,* 480 U.S. 531, 545, 107 S.Ct. 1396,

94 L.Ed.2d 542; *see also Catron County Bd. of Comm'rs, New Mexico v. United States Fish & Wildlife Serv.,* 75 F.3d 1429, 1440 (10th Cir.1996); *Citizens for Environmental Quality v. United States,* 731 F.Supp. 970, 996 (D.Colo.1989). Here, however, the damage to the environment has occurred. Further, the damage continues. If an injunction does not issue, there is a substantial likelihood that the public health and environment will suffer ongoing irreparable harm. Without financial assurance, remediation of the Facility may never be accomplished or may be accomplished only with public funds. The United States cites defendants' repeated claims of limited financial resources and the stated intent to abandon the facility before remediation. Defendants have threatened bankruptcy. Defendants have also engaged in a pattern of debt reduction and divestment, decreasing available cash and jeopardizing their ability to pay for remediation.

Defendants respond that the public health and environment are better served by application of their limited financial resources to remediation rather than financial assurances. Defendants argue that financial assurance is not the overriding purpose of RCRA. In support of this argument, they cite *United States v. Production Plated Plastics, Inc.,* 762 F.Supp. 722 (W.D.Mich.1991). In *Production Plated Plastics,* the United States moved for preliminary injunctive relief, requesting that the court order the defendants to implement an approved closure plan and provide financial assurance for closure. Production Plated Plastics, Inc. ("PPP") began its operations in 1969. *Id.* at 727. In 1980, PPP submitted a Part A application to achieve interim status. PPP, however, did not meet the financial responsibility requirements and lost its interim status on November 8, 1985. Despite losing its interim status, PPP continued its operations until 1987, discharging hazardous waste into unlined surface impoundments and operating waste piles. In 1988, PPP submitted a closure plan that estimated the cost of closure at $2,300,-000. The Michigan Department of Natural Resources ("MDNR") approved the closure plan in 1988, but PPP failed to implement the approved plan. PPP submitted proposed amendments in 1989 which were not approved by the MDNR. *Id.*

After analyzing the equities, the court ordered the defendants to immediately implement the approved closure plan. The court found, however, little threat of irreparable harm from failure to provide immediate financial assurances. *Id.* at 732. As justification for its decision not to order the provision of financial assurances, the court stated that the order requiring the defendants to implement immediately the approved closure plan adequately protected the public's interest. *Id.*

*Production Plated Plastics* differs from the situation presented here. In *Production Plated Plastics,* the hazardous waste facility had already ceased operating and an approved closure plan existed. Here, PEC continues to operate as a profitable enterprise. Further, no approved closure plan exists. Defendants have engaged in a pattern of debt reduction and asset divestiture, creating the reasonable inference that they seek to avoid payment of remediation costs and civil monetary penalties. Lastly, even if an approved closure plan existed, defendants have demonstrated their unwillingness and professed inability to implement an approved closure plan. For instance, the CDPHE approved a closure plan for the three open waste piles of soil excavated from beneath the plating tanks. Defendants, however, have not implemented the closure plan for these open waste piles. *Production Plated Plastics,* therefore, is factually distinguishable from this case.

Defendants next argue that injunctive relief is inappropriate because the United States has an adequate remedy at law, namely, the imposition of civil monetary penalties. *See Romero–Barcelo,* 456 U.S. at 312, 102 S.Ct. 1798 ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies.") Despite defendants' protestations to the contrary, the existence of an adequate legal remedy is not assured. First, an administrative penalty order was issued by the State of Colorado. Counsel for the State of Colorado represented during the hearing that the civil monetary penalty, if collected, would be deposited into the general fund for

the State of Colorado, not applied directly to remediation. Plaintiff here is the United States, not the State of Colorado. If defendants abandon the facility or declare bankruptcy, the United States, pursuant to other environmental statutes, may bear significant financial burden for remediation. Even assuming that the State of Colorado will collect the civil monetary penalties from defendants, I am not persuaded that this provides adequate legal remedy to the United States. Second, civil monetary penalties of approximately $1,875,000 is substantially less than the expected costs of remediation. Accordingly, I conclude that no adequate legal remedy exists.

Because defendants concede multiple past violations of RCRA, have not commenced substantive remediation, ignored certain directives of the Final Compliance Order issued nearly two years ago, complain of limited financial resources, and threatened bankruptcy, there exists the threat that the public will have to subsidize remediation and proper closure of the Facility. I conclude, therefore, that the failure to provide immediate financial assurances would cause irreparable harm.

### 2. Balancing of Harms

This factor requires the balancing of the competing claims of injury and consideration of the effect on each party of the granting or withholding of the requested relief. *Citizens for Environmental Quality*, 731 F.Supp. at 996. To establish entitlement to a preliminary injunction, the United States must show that the potential injuries to the public health or environment outweigh the injury to the defendants. *Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1200 (10th Cir.1992).

Defendants contend they will suffer significant injury if an injunction mandating financial assurances issues. Defendants first argue that they have inadequate assets to provide financial assurances. As stated in the findings of fact, however, I conclude that defendants, collectively, have the financial ability to provide financial assurances in the amount of $3,500,000.

Defendants next argue that they are unable, collectively, to provide financial assurances as well as pay civil monetary penalties. I agree. This is problematic because the evidence establishes that the defendants will be highly leveraged after providing financial assurances in the amount of $3,500,000. The EPA's decision to prioritize financial assurances, however, should not materially affect defendants's solvency. In any event, the extent to which defendants may be injured by providing financial assurances is less than the injury to the United States, the public health, and the environment if an injunction does not issue. Indeed, because defendants began operating a treatment, storage, and disposal facility years ago, they should have already provided financial assurances. Defendants have operated, albeit illegally, with the financial advantage of not having established and maintained such assurances for several years.

### 3. Likelihood of Success on the Merits

If the United States sought a prohibitory injunction, it need only "raise questions going to the merits so serious, substantial, difficult, and doubtful, as to make them a fair ground for litigation, and thus for more deliberate investigation." *Zurn Constructors, Inc. v. B.F. Goodrich Co.*, 685 F.Supp. 1172, 1180 (D.Kan.1988). Because the United States seeks a mandatory injunction, however, it must show by compelling evidence that it will prevail on the merits. *George Washington Home Owners Ass'ns v. Widnall*, 863 F.Supp. 1423, 1426 (D.Colo.1994).

In order to prevail on the merits, the United States must establish by compelling evidence that it is entitled to financial assurances. As discussed above, I hold that defendants are legally obligated to provide financial assurances because they currently operate a TSDF. Even if defendants did not currently operate a TSDF, they are required to provide financial assurances for their past acts of treatment, storage, and disposal of hazardous waste. I conclude, therefore, that the United States has shown likelihood of success on the merits by compelling evidence.

### 4. Public Interest

In considering the issuance of an injunction, the effect on the public of granting or withholding relief merits particular regard.

*See Romero–Barcelo,* 456 U.S. at 312, 102 S.Ct. 1798. There is no doubt here that issuance of an injunction would serve the public interest. Colorado citizens have a right to expect contamination-free groundwater and soils, a clean river, and a concerted, honest cleanup effort from a company that benefitted from multiple years in violation of RCRA. Denying the government's request for equitable relief, under these circumstances, would permit present harm to increase in scope and intensity and reward defendants for past omissions.

There is no question that the soil and groundwater contamination presents a current threat to the public and the environment. Ultimately, of course, the public will be served by proper remediation. Defendants, however, have failed to comply in good faith with the requirements of federal and state law for approximately two decades. Further, defendants' recent threats of bankruptcy and recent pattern of asset divestiture cause me to suspect their motives and intentions. Under the circumstances of this case, it is necessary that financial assurances be provided. This is, after all, the order of process envisioned by RCRA. Requiring defendants to provide financial assurances may also ensure their good faith participation in the cleanup of contamination they have caused to their profit. Accordingly, I conclude that requiring defendants to provide financial assurances is not adverse to the public interest. Rather, such assurances clearly further the public interest.

### 5. *Conclusion*

For the reasons expressed above, the balance of the equitable factors tips heavily and compellingly in favor of the issuance of an injunction. Injunctive relief requiring defendants to provide financial assurances in accordance with 6 COLO. CODE REGS. 1007–3 § 266 is appropriate in this case. The presence of substantially elevated levels of waste in the soil and groundwater at the site creates a reasonable concern for the public health and environment. Further, defendants' failure to implement complete remediation, failure to comply fully with the Final Compliance Order issued nearly two years ago, failure to pay assessed civil monetary penalties, complaints about financial limita-

tions, and threats of filing bankruptcy disclose an unacceptable degree of risk relative to the "harm" to defendants will incur by providing financial assurance. As discussed above, the United States has demonstrated a substantial likelihood of success on the merits by compelling evidence. A balancing of the equities in this case weighs in favor of requiring defendants to provide with financial assurance requirements.

Accordingly, I ORDER defendants PEC, Redoubt, and Richard Lilienthal to provide financial assurance in the amount of $3,500,-000 pursuant to 6 COLO. CODE REGS. 1007–3 § 266 and all applicable subparts. Defendants shall so comply within thirty days or show good cause as to why they have not achieved such compliance.